[No. 54647–9.   En Banc.   February 9, 1989.]

WASHINGTON PUBLIC UTILITY DISTRICTS' UTILITIES SYSTEM,
*Appellant*, v. PUBLIC UTILITY DISTRICT
NO. 1 OF CLALLAM COUNTY, ET AL,
*Respondents.*

*Essenburg & Staton,* by *Jan L. Essenburg, Dennis J. Pothoven,* and *Jeffrey P. Stark,* for appellant.

*Platt, Irwin, Colley, Oliver, Miller & Wood,* by *Bart G. Irwin,* for respondents Public Utility District No. 1, et al.

*David H. Armstrong* (of *Armstrong & Gleysteen*), for respondent Childress.

BRACHTENBACH, J.—This case involves the validity and coverage of a self–insurance agreement executed jointly by

Washington state public utility districts. Plaintiffs/appellants, Washington Public Utility Districts' Utilities System (WPUDUS), brought a declaratory action seeking a determination of its duty to provide coverage under such an agreement. On cross motions for summary judgment the Superior Court granted defendants' motion for summary judgment finding that the agreement was valid and provided coverage for the claims in question. We granted direct review.

There are two questions. First, whether a public utility district (PUD) has the constitutional and statutory authority to enter into a self–insurance agreement with other state PUD's to provide coverage for indemnification against judgment and defense costs of the PUD's own treasurer upon a direct claim by the PUD against that treasurer. Second, whether the self–insurance agreement at issue in this case provides such coverage.

WPUDUS is an unincorporated association comprising a majority of Washington's public utility districts. WPUDUS was formed in 1953 for the purpose of facilitating the joint purchase of insurance for its members. Defendant/respondent, Public Utility District No. 1 of Clallam County (Clallam), is a member district. Defendant/respondent Warner E. Childress (Childress), is Clallam's treasurer/controller.

In 1974, WPUDUS purchased a comprehensive general liability policy from Fidelity and Casualty Company (F&C policy). In November 1976, WPUDUS learned that the F&C policy could not be renewed on terms acceptable to the member districts. Thus, WPUDUS decided to jointly self–insure against liability claims. In December 1976, the members entered into the Washington Public Utility Districts' Utilities System Liability Self–Insurance Agreement (Agreement). The Agreement was amended and restated as of July 21, 1978. Clerk's Papers, at 472. The Agreement incorporates certain parts of the nonrenewed F&C policy

and provides first layer liability coverage[1] for the participating districts and their officers and employees. Each of the member districts make annual contributions to the self-insurance pool to fund coverage. The contributions are computed by an agreed formula that considers such factors as the district's size and loss experience.

Paragraph 11 of the Agreement, as amended October 21, 1982, which describes coverage provided to members and their officers, provides in part:

> The System [WPUDUS] shall pay from the fund any amount which any member may become legally obligated to pay, subject to the other provisions of this Agreement, arising out of any occurrence which happens during the time that the member was a party hereto. The System shall also pay from the fund subject to the other provisions of this Agreement, any amount which any officer, commissioner or employee of a member shall become legally obligated to pay while acting within the scope of his duties as an officer, commissioner or employee during the time that the member was a party hereto; provided no such amount shall be paid in any case where the Court has found such a person was not acting in good faith.

Clerk's Papers, at 472–73.

In July 1986, a dispute arose between Clallam and its treasurer. The resulting lawsuit involves the coverage described in paragraph 11. Clallam and two of its commissioners, Lawrence H. Haas and Hugh E. Simpson, Jr., individually as ratepayers and in their official capacities, filed a complaint naming as defendants/respondents Childress, individually and in his official capacity as treasurer/controller of Public Utility District No. 1 of Clallam County; Robert Graham, in his official capacity as State Auditor; and the State of Washington. The complaint alleged that

---

[1]WPUDUS members also acquired an excess liability policy from the Evanston Insurance Company. Clerk's Papers, at 226. The coverage provided by the excess policy is not at issue in this case. The policy does, however, purport to provide public officials' liability insurance, which covers "any claim" for a "wrongful act." Clerk's Papers, at 252, 246.

Childress was liable in damages to Clallam for breach of a public official's duty. The claims were premised on theories of negligence and strict accountability, and alleged that Childress caused the loss of $1.7 million of district funds by investing those funds in a securities plan that fell apart. There is no claim of dishonesty.

In September 1986, WPUDUS accepted defense of Childress in the Clallam lawsuit with a full reservation of rights. Pursuant to the terms of the Agreement, Clallam requested that WPUDUS provide coverage for the claims against Childress. Shortly thereafter, WPUDUS initiated this declaratory action in King County Superior Court. The trial court, on cross motions for summary judgment, ordered on the merits as follows:

> The Self–Insurance Agreement, as amended, provides coverage to Warner Childress, Treasurer/Controller of Public Utility District No. 1 of Clallam County, against liability for the loss sustained by Public Utility District No. 1 of Clallam County as generally described by Summons and Complaint filed in Clallam County Superior Court under Cause No. 86–2–00427–3; and that the coverage includes both coverage for loss and defense costs.
>
> That public utility districts of the State of Washington have the authority and the power to enter into and perform the Self–Insurance Agreement, as amended, which includes the coverage above described.
>
> That pursuant to CR 54(b), the court hereby makes an express determination that there is no just reason for delay and the court expressly directs that the above order is a final judgment of the court upon which an appeal can be taken.

Clerk's Papers, at 777–78.

WPUDUS has appealed this order arguing that there is no authority under Washington law to enter into the Agreement and that the Agreement would nevertheless prohibit coverage for the claims in question. In addition, Clallam has cross–appealed the trial court's order denying Clallam's motion to strike portions of affidavit submitted in support of WPUDUS's motion for summary judgment.

AUTHORITY TO ENTER INTO AGREEMENT

■ Washington PUD's, as municipal corporations, are limited to those powers expressly granted and to powers

> necessarily or fairly implied in or incident to the powers expressly granted, and also those essential to the declared objects and purposes of the corporation.

*Port of Seattle v. State Utils. & Transp. Comm'n,* 92 Wn.2d 789, 794–95, 597 P.2d 383 (1979); *see Chemical Bank v. WPPSS,* 99 Wn.2d 772, 792, 666 P.2d 329 (1983); *Tacoma v. Taxpayers,* 108 Wn.2d 679, 692, 743 P.2d 793 (1987).

Public utility districts are expressly authorized by statute "to exercise jointly all powers granted to each individual district," RCW 54.16.200; to "sue in any court of competent jurisdiction," RCW 54.16.110; to indemnify their officers and employees against liability claims, RCW 54.16.097; and to purchase liability insurance for officers and employees, RCW 54.16.095, .096; *see* RCW 36.16.138. These provisions are to be construed liberally in order to effectuate the purposes of RCW Title 54, which deals specifically with public utility districts. RCW 54.44.900.

This court's primary objective in interpreting a statute is to ascertain and give effect to the intent of the Legislature. *State v. Keller,* 98 Wn.2d 725, 728, 657 P.2d 1384 (1983). The intent must be determined primarily from the language of the statute itself; however, if the intent is not clear from the language of the statute, the court may resort to statutory construction. *Department of Transp. v. State Employees' Ins. Bd.,* 97 Wn.2d 454, 458, 645 P.2d 1076 (1982). But "'where the language of a statute is clear and unambiguous, there is no room for judicial interpretation.'" *PUD 1 v. Public Empl. Relations Comm'n,* 110 Wn.2d 114, 118, 750 P.2d 1240 (1988) (citing *Roza Irrig. Dist. v. State,* 80 Wn.2d 633, 635, 497 P.2d 166 (1972)). Ultimately, the court should strive to

> determine what the statute means. That usually means ascribing to the words of the statute their plain and ordinary meaning. Intent, if ascertainable, may be of

assistance, but cannot override an otherwise discernible, plain meaning. *North Coast Air Servs., Ltd. v. Grumman Corp.,* 111 Wn.2d 315, 321, 759 P.2d 405 (1988).

In construing a statute, courts may glean legislative intent from a consideration of the legislative history of the statute, as well as from an examination of other statutes dealing with the same subject. *Department of Transp. v. State Employees' Ins. Bd., supra* at 458. WPUDUS argues that two events in the evolution of statutes empowering public entities to insure and indemnify their employees evidence an intent to authorize such protection only against claims of third parties: the repeal of sovereign immunity and the subsequent enactment of several indemnification statutes. Thus, WPUDUS argues, neither a single PUD nor a group of PUD's acting jointly have the authority to indemnify their officers and employees against direct claims by the PUD or its ratepayers.

The sovereign immunity argument begins by pointing out that prior to the abrogation of a municipal corporation's sovereign immunity in 1967, a public entity could not be held liable to a third party for the tortious acts of the entity's employees. Thus, using public funds to purchase insurance or indemnify employees would only benefit the employee and constitute an unconstitutional gift of public moneys. With the repeal of sovereign immunity, public entities faced liability for the tortious conduct of its employees toward third parties. *See* RCW 4.96.010. Consequently, indemnification against or insurance for these claims equally benefited the state and no longer constituted an unconstitutional gift of public funds. Therefore, WPUDUS asserts, insurance and indemnification for a public official's misconduct should only extend to third party claims.

Following the repeal of sovereign immunity, several statutes, including RCW 54.16.097, were enacted relating to the purchase of liability insurance and indemnification. *See* RCW 35.21.205; 36.16.138; 48.62.040. WPUDUS concludes

that since the Legislature enacted these statutes closely following the repeal of sovereign immunity, the Legislature must have intended them to apply only to third party claims against the public entity. While there is some merit to the logic of WPUDUS's theory, there is no legislative history to be found in the House or Senate Journals or in the reports from the Committee on Local Government that indicates an intent to either limit coverage provided by these laws to third party claims or to include claims by the entity itself. For the most part, the language of these statutes is virtually identical throughout and does not expressly acknowledge or prohibit the type of coverage in question. RCW 48.62.040 is somewhat of an exception.

RCW 48.62.040 generally authorizes public entities, including PUD's, to individually or collectively purchase liability insurance and/or obtain risk management services. The statute provides, *inter alia,* that

> liability insurance shall include but not be limited to coverage for claims arising from the tortious or negligent conduct of the local government entity . . . as a result of which a claim may be made against the local government entity.

RCW 48.62.040(2)(a).

WPUDUS argues that the last phrase in the above quoted language evidences a clear intent to limit coverage to third party claims. This argument has some logical merit. However, the statute does not purport to be an exclusive definition of liability insurance coverage, and the subsection defining coverage limits its proscriptions to entities organized under RCW 48.62.040. WPUDUS was organized under RCW 54.16.200. Also, the authority granted by RCW 48.62.040 is by its terms additional or alternative to the power granted in RCW 54.16.097, which specifically authorizes the indemnification of officers and employees of public utility districts. There is no language in RCW 54.16-.097 purporting to limit coverage to third party claims.

■ We have considered WPUDUS's several remaining arguments on the authority issue and find them unpersuasive. For example, WPUDUS argues that allowing coverage for the claims in question would constitute an unconstitutional gift of public funds. An expenditure of public funds is unconstitutional if it is without consideration and with donative intent. *Bellevue v. State,* 92 Wn.2d 717, 720, 600 P.2d 1268 (1979); see Brief of Appellant, at 37. The Agreement clearly limits any payment to the good faith rendering of services. A rendering of services constitutes consideration; therefore, this situation is removed from the realm of "gifts" prohibited by Const. art. 8, § 7. *See General Tel. Co. of Northwest, Inc. v. Bothell,* 105 Wn.2d 579, 588, 716 P.2d 879 (1986).

RCW 54.16.097 is a permissive statute and by its plain meaning allows indemnification of "*any* action, claim or proceeding" against a PUD officer or employee. (Italics ours.) A PUD has the constitutional and statutory power to sue one of its own officers or employees, and it also has the power to indemnify its officers and employees and maintain an effective risk management program. There is no language in the statutory authorization that expressly prohibits indemnification of an officer against a claim by the PUD itself.

■■ In this case, it is not clear from either the language of the statutes or their legislative history whether the Legislature intended to allow insurance and indemnification of *only* third party claims against a PUD. Thus, this court should adopt an interpretation that best advances the objects and purposes of the legislation. *Department of Transp. v. State Employees' Ins. Bd., supra* at 459. Without regard to who brings a claim against the public officer, the obvious purpose of the statutes in question is to allow protection against loss associated with public officials' good faith efforts.

In recent years the volume and size of liability claims against corporate officers, in both public and private sectors, has caused a substantial rise in the cost of adequate

protection and has diminished the availability of coverage. *See* Rynard, *The Local Government as Insured or Insurer: Some New Risk Management Alternatives,* 20 Urb. Law. 103, 103–04 (1988). Consequently, there is perceived a need to provide increased protection in the form of liability insurance and indemnification for the actions of officers or employees acting within the scope of their duties.

In this case, the officer is allegedly responsible for the loss of $1.7 million in district funds. Precluding coverage for indemnification against such a loss as a matter of law will not serve the needs of the public body or its officers and employees. It may make it more difficult for municipal corporations to attract and retain talented individuals and it will discourage those individuals from taking good faith risks that benefit the district and its ratepayers. *See* Block, Barton & Garfield, *Advising Directors on the D&O Insurance Crisis,* 14 Sec. Reg. L.J. 130, 143 (1986). Finally, the coverage described in the statute is limited to the good faith exercise of an officer's duties; consequently, there is no possibility that providing coverage will eliminate the threat of personal liability as a deterrent to aberrant behavior.

We hold that a public utility district has the requisite authority to enter into a self–insurance agreement allowing the indemnification of its officers and employees against direct claims by the district itself. While such authority is not expressly granted by statute, it is fairly implied and essential to the declared objectives of a municipal corporation. Nowhere is such authority expressly denied.

### COVERAGE UNDER THE AGREEMENT

██ Insurance policies are to be construed as contracts, and interpretation is a matter of law. *State Farm Gen. Ins. Co. v. Emerson,* 102 Wn.2d 477, 480, 687 P.2d 1139 (1984). The entire contract must be construed together in order to give force and effect to each clause. *Morgan v. Prudential Ins. Co. of Am.,* 86 Wn.2d 432, 434, 545 P.2d 1193 (1976). The court must enforce the contract as written if the language is clear and unambiguous. *Morgan,* at 435. However,

if the *language on its face* is fairly susceptible to two different but reasonable interpretations, the contract is ambiguous, and the court must attempt to discern and enforce the contract as the parties intended. *Greer v. Northwestern Nat'l Ins. Co.*, 109 Wn.2d 191, 198–200, 743 P.2d 1244 (1987); *Morgan,* at 435. In the event of an ambiguity, the contract will be construed in favor of the insured. *Greer,* at 201; *Morgan,* at 435.

The court will determine the parties' intent by viewing the contract as a whole, examining its purpose, objective, and subject matter, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their respective interpretations. *Greer,* at 200 (quoting *Stender v. Twin City Foods, Inc.,* 82 Wn.2d 250, 254, 510 P.2d 221 (1973)). The contract will be given a practical and reasonable interpretation that fulfills the object and purpose of the contract rather than a strained or forced construction that leads to an absurd conclusion, or that renders the contract nonsensical or ineffective. *Morgan,* at 434–35.

Clallam argues that the Agreement is unambiguous and that the coverage in question is provided. Paragraph 11 of the Agreement clearly states that WPUDUS will pay from the fund "*any* amount which any officer, commissioners or employee of a member shall become legally obligated to pay while acting within the scope of his duties . . ." (Italics ours.) Clerk's Papers, at 473. It is important to keep in mind that neither party disputes the authority of a municipal corporation, *i.e.,* a PUD, to indemnify its officers against claims made by third parties; the specific point of contention focuses on claims made by the PUD itself or its ratepayers.

Washington courts have not examined this question of coverage for claims by a municipal corporation against its own employee for loss of the corporation's funds. However, two recent decisions in federal district courts have reached

the merits of an analogous dispute in the context of "regular" corporations.[2]

In National Union Fire Insurance Company v. Seafirst Corporation, No. 85–396R (W.D. Wash. Mar. 19, 1986), the first decision on the subject, the court granted the insured, Seafirst Corporation, summary judgment on its claim that Seafirst's director and officer liability (D&O) policy covered an action brought by Seafirst Corporation itself against certain of its former officers and directors involved in loan participation losses. The directors and officers had originally been sued in several shareholder derivative actions and the corporation decided to prosecute the claims itself. Applying Washington law, the court reasoned:

> After carefully reviewing the language of the policy, the court concludes that the policy plainly and unambiguously covers direct action by Seafirst itself against its own directors and officers. According to the policy terms, National Union must pay for loss suffered as a result of "*any* claim or claims" against the directors and officers. The phrase "*any* claim or claims" clearly includes direct actions, and no other provision in the policy purports to limit the scope of the phrase so as to exclude them from coverage.

National Union Fire Insurance Company v. Seafirst Corporation, No. 85–396R at 6 (W.D. Wash. Mar. 19, 1986).

Similarly, in *National Union Fire Ins. Co. v. Continental Ill. Corp.,* 666 F. Supp. 1180 (N.D. Ill. 1987), the court rejected National Union's argument that industry custom

---

[2]Before moving to a discussion of these two cases, it is necessary to briefly explore the relevant similarities and differences between municipal corporations and their private counterparts. Both are creatures of the state and, as such, are evidenced by a charter with defined limits and perpetual succession. 1 E. McQuillin, *Municipal Corporations* § 2.07(a), at 152 (3d rev. ed. 1987). In this sense, both are corporate entities and exercise their business or proprietary functions similarly. However, a municipal corporation is also a body politic. When it is acting as a political arm of the state and exercising its governmental functions the comparison to private corporations falters. But for purposes of this case of a PUD exercising its proprietary role of insuring to protect its officers from liability, municipal corporations should not be distinguished from their private cousins.

supported exclusion of an insured corporation's claim against its own officers and directors. The court stated:

> What Insurers want to prove via custom and practice is that the terms "any claim" and "any claimant" in fact mean "some claims" and "some claimants." That cannot be viewed as anything but an attempt to contradict the express Policy terms. . . . [N]othing in the Policies even hints at a limitation on coverage because of the indemnity [*sic*] of a claimant, and that is the kind of unstated limitation Insurers are seeking to add by excluding claims by Continental against its own directors and officers.

*Continental,* at 1192–93.

█ These cases illustrate the point that if policy language unambiguously covers direct actions, then it is not anomalous to allow a corporation to sue its own employee and seek coverage for that employee under its professional errors and omissions policy. While claims against directors and officers traditionally took the form of third party lawsuits or shareholders' derivative actions, courts are recognizing that coverage for direct actions is not antithetical to the objects and purposes of these policies. If insurers do not want to provide coverage for such claims an exclusion can be easily written into the contract.

In this case, we find that the language of the Agreement unambiguously covers direct actions by the PUD against its own officer. The language of the Agreement is not susceptible to two different meanings: "any claims or actions" has only one meaning; it does not mean "some claims or some actions." *See, e.g., National Union Fire Ins. Co. v. Continental Ill. Corp., supra.* In fact, WPUDUS concedes that there "is no apparent limitation contained in this language [of paragraph 11] which would preclude *coverage* for a claim by a Member against its own Employee." (Italics ours.) Brief of Appellant, at 78.

WPUDUS argues, however, that while the literal language of the Agreement may provide coverage, the exclusions incorporated into the Agreement take it away. We disagree.

Paragraph 11 of the Agreement, which contains the Agreement's only reference to applicable exclusions, states:

No payment shall be made under this Agreement with respect to any event or situation which is excluded from coverage under the terms of the Policy. The original policy is in the possession of the Board and the policy is incorporated herein and made a part hereof.

Clerk's Papers, at 473. On its face, there is no ambiguity, as WPUDUS asserts, in this incorporation clause. The plain meaning of the language is that any "events" or "situations" excluded under the F&C policy will also be excluded under the Agreement. The only excluded "event" or "situation" arguably applicable to this case is described in exclusion (k) of the F&C policy.

Exclusion (k), which essentially prohibits coverage of property damage to property owned, used, or controlled by the insured, provides in part:

This insurance does not apply:
(k) [to] property damage to
  (1) property owned or occupied by or rented to the insured,
  (2) property used by the insured, or
  (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;

Clerk's Papers, at 269.

The F&C policy defines property as tangible property. Thus, the "event" or "situation" excluded by the F&C policy was the loss of tangible property in the care, custody, or control of the insured. Consequently, the Agreement excludes coverage for the loss of *tangible* property in the care, custody, or control of the insured. In this case, coverage for a claim relating to the loss of district funds is not prohibited by exclusion (k) since the loss resulting from the securities investment is not damage to tangible property.[3]

_____

[3]The parties do not dispute the fact that the securities investment losses in this case do not constitute tangible property as the term is used in insurance policies. *See, e.g., Travelers Indem. Co. v. State,* 140 Ariz. 194, 680 P.2d 1255 (Ct.

WPUDUS counters that the parties intended to incorporate only the exclusions of the F&C policy, not the definitions. See Clerk's Papers, at 603. Thus, it would be necessary to look elsewhere in order to define the term property damage. WPUDUS argues that the leading Washington cases define "property damage" to include loss to both tangible and intangible property. *See Labberton v. General Cas. Co. of Am.*, 53 Wn.2d 180, 332 P.2d 250 (1958); *Yakima Cement Prods. Co. v. Great Am. Ins. Co.*, 93 Wn.2d 210, 608 P.2d 254 (1980). On this view, WPUDUS asserts, exclusion (k) denies coverage for claims related to the loss of the securities (intangible property) in the care, custody, or control of the insured.

First, both *Labberton* and *Yakima Cement* can be distinguished on their facts; both involved general comprehensive liability policies, not errors and omissions policies as in the case at bar, and both cases were construing "tangible property damage" in the context of a grant of coverage as opposed to an exclusion. In any event, assuming arguendo that we were to accept WPUDUS's analysis on the definition of "property damage," its interpretation would force a strained construction of the contract that conflicts with the Agreement's purpose of providing broader coverage than the F&C policy (Clerk's Papers, at 608), and it would render the errors and omissions coverage for officers and employees provided by the Agreement (see Clerk's Papers, at 598–600) meaningless and ineffective.

Paragraph 11 of the Agreement describes two distinct types of coverage. The first is liability protection for member districts:

> The System [WPUDUS] shall pay from the fund any amount which any *member* may become legally obligated to pay, subject to the other provisions of this Agreement, arising out of any occurrence which happens during the time that the member was a party hereto.

App. 1984); *Giddings v. Industrial Indem. Co.*, 112 Cal. App. 3d 213, 169 Cal. Rptr. 278 (1980).

(Italics ours.) Clerk's Papers, at 473. Second is protection for members' officers and employees:

> The System shall also pay from the fund, subject to the other provisions of this Agreement, any amount which any officer, commissioner or employee of a member shall become legally obligated to pay while acting within the scope of his duties as an officer, commissioner or employee during the time that the member was a party hereto; provided no such amount shall be paid in any case where the Court has found that such person was not acting in good faith.

Clerk's Papers, at 473.

The latter provision describes the professional errors and omissions coverage that the parties included in the Agreement, but that was not described in the F&C policy. The F&C policy insured against bodily injury and property damage; it was a straightforward, comprehensive general liability policy. When the PUD's dropped the F&C policy and self–insured they added this language commonly referred to as "errors and omissions" coverage. The PUD's also secured the Evanston excess insurance policy, which similarly provided errors and omissions coverage. Clerk's Papers, at 252, 246.

Errors and omissions coverage is designed to cover loss related to the good faith acts of an officer or official that are within the scope of employment. C. Kulp & J. Hall, *Casualty Insurance* 123 (4th ed. 1968). Exclusions for intangible property damage and property in the care, custody, or control of the insured are anathema to errors and omissions coverage. *Casualty Insurance,* at 123–24. The exclusion of intangible property in the control of the insured would effectively eliminate the professional liability, or "errors and omissions," coverage the parties intended to provide through the Agreement. This court cannot adopt an interpretation of an exclusion in an insurance contract that is contrary to the objectives and purposes of the coverage defined in the contract. Moreover, exclusionary provisions are contrary to the fundamental purpose of an insurance

policy; and, therefore, will be narrowly construed in favor of the insured. *Phil Schroeder, Inc. v. Royal Globe Ins. Co.,* 99 Wn.2d 65, 68, 659 P.2d 509 (1983), *modified,* 101 Wn.2d 830, 683 P.2d 186 (1984); *Dautel v. United Pac. Ins. Co.,* 48 Wn. App. 759, 762, 740 P.2d 894 (1987); *see McDonald Indus., Inc. v. Rollins Leasing Corp.,* 95 Wn.2d 909, 915, 631 P.2d 947 (1981).

The most reasonable interpretation of this insurance contract is that it was intended to provide coverage for any liability of a PUD's officers and directors acting in good faith and within the scope of their duties, and that the exclusions were incorporated as the parties understood them, in other words, as they were defined in the F&C policy. On this view, we conclude that the Agreement covers indemnification against the claims by Clallam against its treasurer/controller (Childress), and that no other language in the policy excludes such coverage.

Finally, since we find no ambiguity in the language of the contract, we conclude that the trial court erred in admitting affidavits containing evidence of the parties' intent. CR 56(e) provides that affidavits "shall set forth such facts as would be admissible in evidence". Any statements consisting of inadmissible evidence must be treated as mere surplusage and disregarded.[4] *Henry v. St. Regis Paper Co.,* 55 Wn.2d 148, 151, 346 P.2d 692 (1959). Extrinsic evidence offered to alter and interpret the terms of an unambiguous contract is inadmissible. *Harding v. Warren,* 30 Wn. App. 848, 850, 639 P.2d 750 (1982). Extrinsic evidence of the parties' intent is admissible only if the contract is ambiguous. *McGary v. Westlake Investors,* 99 Wn.2d 280, 286, 661 P.2d 971 (1983). We reverse the trial court's order denying

---

[4]Clallam's argument regarding the admissibility of evidence focuses solely on the question of whether evidence of intent is allowed when there is arguably no ambiguity in the instrument. However, much of the evidence of intent in the record could also be subject to exclusion as opinions on legal questions. While this issue was briefed in the trial court, Clallam assigns no error based on such a theory.

Clallam's motion to strike portions of the affidavits submitted in support of WPUDUS's motion for summary judgment. However, this error does not affect our disposition of the case at bar.

## COSTS AND ATTORNEYS' FEES

The trial court awarded Clallam attorney fees in the amount of $28,632.88 based on paragraph 19 of the Agreement, which states:

> In the event of any litigation between any party hereto growing out of or relating to this Agreement, the prevailing party shall be awarded its taxable costs and the reasonable fees of its counsel in trial or in appellate proceedings.

Clerk's Papers, at 468.

WPUDUS admits that Clallam was properly awarded *its* fees; however, WPUDUS argues that fees attributable to Haas and Simpson were improperly included in the trial court's award. WPUDUS suggests that "Haas and Simpson were personally responsible to Mr. Irwin's firm for . . . [one–half of the total] attorneys' fees". Brief of Appellant, at 81. WPUDUS then asserts that the trial court erred by not requiring Clallam to submit evidence that its request did not include fees attributable to Haas and Simpson. Brief of Appellant, at 81.

Clallam concedes that pursuant to paragraph 19 of the Agreement WPUDUS is not responsible for fees incurred by Haas and Simpson. However, Clallam asserts that the record is devoid of any indication that a claim has been made for fees attributable to Haas or Simpson. Brief of Respondent, at 67.

A careful review of Clallam's request for attorney fees (Clerk's Papers, at 707–20) reveals no specific time attributable to the representation of Haas or Simpson. Nor does WPUDUS identify any other part of the record supporting its suggestion that Haas and Simpson were responsible for one–half of the requested fees. WPUDUS has cited no factual basis in the record nor any precedent to support its

argument on attorney fees. Therefore, we find that the trial court's award of fees was reasonable.

The order of the trial court in this declaratory action is affirmed and reversed in part. We remand the case for a determination of costs and attorney fees on appeal to be awarded respondents pursuant to the parties' agreement.

CALLOW, C.J., and UTTER, DOLLIVER, DORE, PEARSON, ANDERSEN, DURHAM, and SMITH, JJ., concur.