# United States Court of Appeals for the Federal Circuit

---

**PHYTELLIGENCE, INC.,**
*Plaintiff-Appellant*

**v.**

**WASHINGTON STATE UNIVERSITY,**
*Defendant-Appellee*

---

2019-2216

---

Appeal from the United States District Court for the Western District of Washington in No. 2:18-cv-00405-RSM, Judge Ricardo S. Martinez.

---

SEALED OPINION ISSUED:  August 25, 2020
PUBLIC OPINION ISSUED:  August 27, 2020*

---

JOHN PAUL FLYNN, Wilson, Sonsini, Goodrich & Rosati, PC, San Francisco, CA, argued for plaintiff-appellant.  Also represented by COLLEEN BAL, JOSHUA ALEC BASKIN.

STUART RUSSELL DUNWOODY, Davis Wright Tremaine LLP, Seattle, WA, argued for defendant-appellee.

---

\*   This opinion was originally filed under seal and has been unsealed in full.

Before PROST, *Chief Judge*, REYNA and STOLL, *Circuit Judges*.

REYNA, *Circuit Judge*.

Phytelligence, Inc., appeals from the United States District Court for the Western District of Washington's grant of summary judgment in favor of Washington State University.  Because we agree with the district court's decision, we affirm.

BACKGROUND

I

Appellant Phytelligence, Inc., ("Phytelligence") was an agricultural biotechnology company that used tissue culture to grow trees for sale to nurseries and growers. Phytelligence has since ceased operations and is in receivership.

In November 2012, Phytelligence and appellee Washington State University ("WSU") began discussing the propagation, i.e., growing, of "WA 38" apple trees—a new apple cultivar that WSU developed and patented.  On November 9, 2012, WSU sent Phytelligence a draft propagation agreement, which provided that Phytelligence could propagate WA 38 trees.  The draft agreement forbid Phytelligence from selling WA 38 trees "unless [Phytelligence] ha[d] authorization to do so under a separate contract with [WSU], or an agent of [WSU], in accordance with Section 4 of this Agreement."  J.A. 119.

Key to this appeal is Section 4 of the draft propagation agreement, entitled "option to participate as a provider and/or seller in [WSU] licensing programs," which provided that:

If [Phytelligence] is an authorized provider in good standing . . . by signing this Agreement, [Phytelligence] is hereby granted an option to participate as a provider and/or seller of Plant Materials listed in

> Exhibit A, if the Cultivar is officially released by WSU and becomes available for licensing by [WSU] . . . . [Phytelligence] will need to sign a separate contract with [WSU], or an agent of [WSU], to exercise this option.

J.A. 51.

On November 18, 2012, days before Phytelligence executed the agreement, Phytelligence reached out to WSU "to clarify" that to exercise its option under Section 4, WSU would need to "grant [it] a separate license for the purpose of selling." J.A. 631. On November 19, 2012, WSU responded "[y]es," but also noted that there was uncertainty as to the terms of that future license. Specifically, WSU noted that "there exists the possibility that if we license WA 38 to an exclusive licensee, that company/person/group may want to do his/her own plant propagation without outside assistance or may want to do that under contract with its own contractors." *Id.* WSU also noted that:

> We have no idea how WA 38 will be licensed at this time. It would take any form: under an open release through a nursery group, for example, to an exclusive license with a company, group of individuals, coop., etc. That decision has not yet been made, so there can be no guarantees made to anyone at this point.

*Id.* During this exchange, Phytelligence noted that it understood the Propagation Agreement to be a "strictly research undertaking," in which it would propagate WA 38 for WSU and be allowed to "experiment with propagation techniques." J.A. 635. WSU indicated a similar understanding of the Propagation Agreement, noting that "[t]he intent of the agreement is to give [Phytelligence] the ability to propagate WA 38." *Id.*

On November 19, 2012, Phytelligence reached out to WSU a second time, acknowledging the uncertainty

surrounding WSU's future licensing of WA 38. Phytelligence also noted that given the "wispy forward commitment" concerning the option in Section 4, it was hesitant to execute the Propagation Agreement. J.A. 247. Phytelligence noted that "[i]t may make more sense" for it to conduct its research with a separate lab or to proceed forward with a "fee-for-service contract." *Id.* WSU responded that same day, noting that the "fact of the matter is that what happens from a commercialization/licensing point of view in regard to WA 38 and future apple releases is completely out of [our] hands at the moment." J.A. 640.

On November 23, 2012, Phytelligence reached out to WSU again. Phytelligence acknowledged that WSU is "moving somewhat cautiously here," but noted that "everyone thinks that . . . Phytelligence and others would have a shot at securing commercial licenses." J.A. 249. Phytelligence also noted that

> since this [Propagation] agreement is a precursor to any other, [we] suppose there's no harm in going ahead and executing it. Then at least we will have the pieces in place when we are all ready to go beyond R&D mode. With that context, the agreement *is fine as it is.*

*Id.* (emphasis added). On November 27, 2012, Phytelligence executed the "Propagation Agreement" with WSU, without making or even suggesting any changes to Section 4.

## II

In March 2013, WSU issued an "Announcement of Opportunity," i.e., a request for proposals, to companies interested in commercializing WA 38. WSU sought "an exclusive licensee to manage" commercialization of WA 38, "including the contracting of tree propagation to nurseries and others." J.A. 649, 652. WSU sent this announcement

of opportunity to Phytelligence. Phytelligence did not submit a proposal.

In June 2014, WSU accepted the proposal of Proprietary Variety Management ("PVM") and entered into a "Management Contract" with PVM. The Management Contract granted PVM an exclusive license. The Management Contract also required PVM to subcontract exclusively with the Northwest Nursery Improvement Institute ("NNII"), a fruit tree nursery association, to propagate and sell WA 38 trees. Pursuant to the Management Contract, PVM provided NNII with an exclusive sublicense. In turn, NNII provided nonexclusive sublicenses with NNII member nurseries to propagate and sell WA 38 trees. As a result, no industry participant could obtain a license to sell WA 38 without becoming a member of NNII.

On May 18, 2017, Phytelligence formally notified WSU that it wanted to exercise its option under the Propagation Agreement. J.A. 126. WSU responded that under the option clause, Phytelligence had to "<u>sign a separate contract with [WSU], or an agent of [WSU], to exercise this option</u>," and that PVM was WSU's "agent." J.A. 157 (emphasis in original). WSU thus directed Phytelligence to "approach PVM for an agreement." *Id.* Phytelligence reached out to PVM, which required Phytelligence to become a NNII member as a condition to obtaining a license to commercialize WA 38. Phytelligence subsequently notified WSU that it rejected PVM's requirement to become a NNII member. Phytelligence explained that it did "not wish" to join NNII, nor did it believe that NNII membership was a condition contained in Section 4 of the Propagation Agreement. J.A. 165–166.

On September 15, 2017, WSU then presented Phytelligence with three options for propagating and selling WA 38 "on equal footing with other propagators that have commercial rights to WA 38." J.A. 169. One of the options required NNII membership while the other two did not.

Phytelligence rejected WSU's three options. Phytelligence never applied for membership in NNII.

On January 16, 2018, WSU terminated the Propagation Agreement. According to WSU, Phytelligence materially breached section 1.b of the Propagation Agreement when it sold and delivered WA 38 to a third-party without a license to do so. WSU also alleged that such actions infringed its plant patent for WA 38 and its COSMIC CRISP trademark. Also on January 16, 2018, WSU revoked its September 15, 2017, offer to Phytelligence to commercialize the propagation of WA 38.

### III

On February 26, 2018, Phytelligence sued WSU in Washington state court alleging breach of the Propagation Agreement. Specifically, Phytelligence argued that WSU breached the Propagation Agreement "[b]y entering into its arrangements with PVM and refusing to honor the obligations in the Propagation Agreement." J.A. 47. Phytelligence sought damages and specific performance of "the Propagation Agreement resulting in issuance of a license . . . to propagate WA 38 plant materials for commercial sale." J.A. 48. On March 16, 2018, WSU asserted patent and trademark infringement counterclaims and removed the action to federal district court.[1]

WSU then moved for summary judgment, arguing that Section 4 was an unenforceable "agreement to agree" pursuant to Washington state law. J.A. 101. Phytelligence opposed the motion, arguing that Section 4 was not an agreement to agree but rather an enforceable "agreement with open terms." *See* J.A. 294–95.

---

[1]    WSU's counterclaims are not at issue in this appeal.

The district court granted WSU's motion. Phytelligence moved for reconsideration, and in that motion, Phytelligence specified its theory of breach. Phytelligence argued that WSU breached Section 4 by conditioning a license to commercialize WA 38 on Phytelligence becoming a NNII member. The district court denied Phytelligence's motion for reconsideration. WSU then waived any damages related to its counterclaims, and the parties entered a stipulated injunction in order to permit this appeal to proceed. Phytelligence timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

Phytelligence challenges the district court's determination concerning Section 4 on two general grounds. First, Phytelligence argues that, on its face, Section 4 of the Propagation Agreement is an enforceable agreement with open terms and not an unenforceable agreement to agree. Second, Phytelligence argues that evidence extrinsic to the Propagation Agreement indicates that Section 4 is an enforceable agreement with open terms, or, at a minimum, creates a material factual dispute precluding summary judgment. We address each challenge in turn.

We review a grant of summary judgment under the law of the regional circuit, which in this case is the Ninth Circuit. *See, e.g., Cheetah Omni LLC v. AT&T Servs., Inc.*, 949 F.3d 691, 693 (Fed. Cir. 2020). The Ninth Circuit reviews a district court's grant of summary judgment de novo. *See, e.g., L.F. v. Lake Washington School District #414*, 947 F.3d 621, 625 (9th Cir. 2020). Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment may only be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

I

Phytelligence argues that, on its face, Section 4 is not an unenforceable agreement to agree but rather an enforceable agreement with open terms. For the reasons set forth below, we disagree.

The parties agree that the Propagation Agreement is governed by Washington state law. Washington courts follow the "objective manifestation theory" of contract interpretation, which requires a court to look to the reasonable meaning of the contract language to determine the parties' intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* The interpretation of a contract is a matter of law when it does not rely on extrinsic evidence. *Wash. State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Constr. Co.*, 296 P.3d 821, 825 (Wash. 2019); *Wash. Pub. Util Dists.' Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam Cnty.*, 771 P.2d 701, 706 (Wash. 1989).

"An agreement to agree is an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete. Agreements to agree are unenforceable in Washington." *P.E. Sys., LLC v. CPI Corp.*, 289 P.3d 638, 644 (Wash. 2012) (internal quotation marks omitted). Underlying this rule is the fundamental principle that Washington courts are unable to fix the liability of parties based on agreements that are "too indefinite and uncertain." *Sandeman v. Sayres*, 314 P.2d 428, 430 (Wash. 1957) (internal quotation marks omitted); *see also Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004); *Setterlund v. Firestone*, 700 P.2d 745, 746 (Wash. 1985) ("[A]greements must be definite enough on material terms to allow enforcement without the court supplying those terms."). A court will not

enforce an indefinite agreement in order "to avoid trapping parties in surprise contractual obligations." *Keystone*, 94 P.3d at 949 (internal quotation marks omitted).

For example, in *Sandeman*, the Washington Supreme Court determined that a provision for a bonus within an employment contract was an unenforceable agreement to agree. 314 P.2d at 428–29. The provision provided that "[a] suitable incentive . . . will be paid [to] you and *will be decided upon*, after the first three (3) months of our marketing operations . . . . This period of time is specified to enable us to properly evaluate the market and acceptability of our products." *Id.* at 428. The court found this provision to be an agreement to agree because it required "a further meeting of the minds of the parties before a complete and enforceable agreement to pay a commission." *Id.* at 430. Specifically, the court recognized that although the employer "offered to pay the respondent a commission and/or bonus," the bonus was to be "decided upon by the company and the respondent three months later, in order to enable the company to properly evaluate the market and acceptability of its products." *Id.*

By contrast, "[u]nder an agreement with open terms, the parties intend to be bound by the key points agreed upon with the remaining terms supplied by a court or another authoritative source, such as the Uniform Commercial Code." *P.E. Sys.*, 289 P.3d at 644 (quotation marks omitted). Any missing or open term can therefore be "easily" discerned by the court. *Id.*

For example, in *P.E. Systems*, a case relied on by both parties in this appeal, the parties entered into an agreement in which P.E. Systems offered to analyze and reduce the credit card processing costs of CPI Corporation ("CPI"), and CPI provided that it would pay P.E. Systems a portion of the savings realized. *Id.* at 640. The agreement provided that the amount of savings would be determined by a client's "Historic Cost," which would be agreed to by the

parties and included in the addendum to the contract. *Id.* The Historic Cost was left blank. *Id.* at 641. The appeals court found that in light of the missing Historic Cost, this was an agreement to agree. *Id.* The Washington Supreme Court disagreed, explaining that this was an enforceable agreement with an open term because the contract included an agreed to formula for calculating the Historic Cost. *Id.* at 644. Thus, the Historic Cost was "an open term that can easily be calculated." *Id.*

Here, Section 4 of the Propagation Agreement provides that Phytelligence is "hereby granted an option," but that Phytelligence "will need to sign a separate contract with [WSU], or an agent of [WSU], to exercise this option." J.A. 51. Thus, the plain terms of the agreement provide that Phytelligence's option turns on a future contract between the parties, and thus "a further meeting of the minds of the parties" is required before Phytelligence can commercialize WA 38. *P.E. Sys.*, 289 P.3d at 644. This renders Section 4 an unenforceable agreement to agree.

Additionally, contrary to Phytelligence's position, Section 4 is not like the agreement with open terms in *P.E. Systems*. As noted earlier, in *P.E. Systems*, the court supplied the missing term from an objective formula that was agreed to by the parties and contained within the contract. *See id.* In contrast, here, the Propagation Agreement provides the court with no objective method for determining the terms of the "separate contract" between Phytelligence and WSU (or its agent). Phytelligence even admits in its briefing that the terms of the separate contract had not yet been determined at the time it entered into the Propagation Agreement. Phytelligence notes that "to exercise the option, [it] had to sign a separate contract with WSU or its agent; *the terms of that contract had not yet been determined.*" Appellant's Br. at 24 (emphasis added). Thus, given that Phytelligence's licensing rights turned on a future "separate contract," the terms of which were not yet

determined by the parties, Section 4 is an unenforceable agreement to agree.

## II

## A

Phytelligence further argues that extrinsic evidence establishes that Section 4 is an enforceable contract with open terms. Specifically, Phytelligence argues that the parties "reached a clear and unequivocal agreement on the method" for determining Section's 4 open licensing terms. Appellant's Br. at 33. For the reasons set forth below, we disagree.

According to Phytelligence, the purportedly agreed upon method required WSU to offer Phytelligence the same "standardized licensing terms" it planned to offer other industry participants. Phytelligence cites to a form license included in the record on appeal as the "WSU-approved standard licensing terms," which "WSU promised Phytelligence." Appellant's Br. at 35 (citing form agreement at J.A. 504–23) ("Form License").[2] Thus, Phytelligence argues, "[n]othing was left for future negotiation; no further meeting of the minds was required" for Phytelligence to exercise its option to a license under Section 4. Appellant's Br. at 33.

To assist in determining the meaning of contract language, Washington courts, in addition to the objective manifestation theory, apply the "context rule." *See Berg v. Hudesman*, 801 P.2d 222, 229–30 (Wash. 1990). This rule allows examination of the context surrounding a contract's execution, including the consideration of extrinsic evidence to help understand the parties' intent. *Hearst,* 115 P.3d

---

[2]    The Form License is the nonexclusive sublicense that NNII offered to industry participants to commercialize WA 38 trees.

at 266–67.  However, extrinsic evidence is to be used "to determine the meaning of *specific words and terms used* and not to show an intention independent of the instrument or to vary, contradict or modify the written word." *Id.* at 267 (internal quotation marks omitted; emphasis in original).  Notably, a court "must distinguish the parties' intent at the time of formation from the interpretations the parties are advocating at the time of the litigation." *Int'l Marine Underwriters v. ABCD Marine, LLC*, 313 P.3d 395, 400 (Wash. 2013); *see also Viking Bank v. Firgrove Commons 3, LLC*, 334 P.3d 116, 120 (Wash. Ct. App. 2014) (noting that "[t]he primary objective in contract interpretation is to ascertain the mutual intent of the parties at the time they executed the contract").

When the meaning of a contract turns on the inferences drawn from extrinsic evidence, contract interpretation is a question of fact. *Berg*, 801 P.2d at 229.  "A question of fact may be determined as a matter of law where reasonable minds could reach but one conclusion." *Keystone*, 94 P.3d at 949 n.10.

As an initial matter, we reject Phytelligence's theory of the case, which is self-contradictory.  According to Phytelligence, the parties agreed that Phytelligence would receive the terms contained in the Form License. *See* J.A. 504–23; Appellant's Br. at 16, 35, 38, 48–50.  The Form License, however, requires the "Licensee" to "be a NNII member nursery in good standing" in order to license WA 38. J.A. 506.  It is also undisputed that no propagator was offered a license to WA 38 unless it was a member of NNII. Membership in NNII is the very requirement that Phytelligence alleges was not required by Section 4 and triggered WSU's breach.  Thus, Phytelligence's claim of breach of contract fails under either premise.  On the one hand, if the parties agreed that the "separate contract" in Section 4 would contain the standard terms of the Form License, then WSU did not breach Section 4 by requiring Phytelligence to become a NNII member.  On the other hand, if the

parties did not agree to such standard terms, Section 4 is unenforceable as an agreement to agree.

Even if we set aside this fundamental flaw in Phytelligence's argument, we would disagree that a reasonable fact finder could conclude that Phytelligence and WSU agreed that the "separate contract" in Section 4 would contain the terms of the "Form License." As noted earlier, WSU and Phytelligence communicated via email before the execution of the Propagation Agreement. WSU notified Phytelligence that it had "no idea how WA 38 would be licensed *at this time*," and that "there can be no guarantees made to anyone at this point." J.A. 631 (emphasis added). WSU also warned Phytelligence that WA 38 could be licensed to an exclusive licensee who may not want "outside assistance." J.A. 247. In response, Phytelligence recognized that Section 4 contained a "wispy forward commitment." *Id.* Phytelligence also recognized that there was "no harm" in signing the Propagation Agreement, despite this wispy forward commitment, because the Propagation Agreement "is a precursor to any other." J.A. 249. Thus, according to Phytelligence, "*[w]ith that context*, the [Propagation] agreement is fine as it is." *Id.* (emphasis added).

On these undisputed material facts, no reasonable fact finder could conclude that *at the time of execution*, Phytelligence and WSU had agreed that the "separate contract" under Section 4 would contain the terms of the Form License. Rather, the email communications between the parties indisputably indicate that at the time the parties executed the Propagation Agreement, WSU did not commit to any definite terms of a future license with Phytelligence. Thus, Section 4 is an unenforceable agreement to agree, even considering the extrinsic evidence in a light most favorable to Phytelligence. *See Keystone*, 94 P.3d at 948.

## B

Phytelligence argues that, regardless of the above referenced email communications, other sources of extrinsic

evidence create a material factual dispute concerning Phytelligence's option under Section 4. We disagree.

Phytelligence first argues that the declaration of Chris Leyerle, Phytelligence's CEO, creates a material factual dispute. Mr. Leyerle's declaration provides that:

> *My understanding* from [WSU personnel] was that there would be an internal process at WSU to decide whether and how to commercialize WA 38. If WSU decided to commercialize WA 38, the process would result in a set of standard terms and conditions pursuant to which industry participants could sell and distribute WA 38. [WSU] assured me that by entering into the Propagation Agreement, Phytelligence would have the option to acquire a license on the standard terms if and when such a license became available.

J.A. 612 (emphasis added).

Mr. Leyerle's declaration, however, is insufficient to create a material factual dispute. Mr. Leyerle's declaration speaks to his subjective "understanding" of his communications with WSU, not to the parties' mutual agreement that Section 4 provided Phytelligence with a "separate contract" based on the terms in the Form License. "It is well settled that a conclusory statement on the ultimate issue does not create a *genuine* issue of fact." *Applied Cos. v. United States*, 144 F.3d 1470, 1475 (Fed. Cir. 1998) (internal quotation marks omitted; emphasis in original) (holding that an "affidavit alone" was insufficient to create a genuine issue of material fact in light of the documentary evidence showing otherwise); *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

Mr. Leyerle's deposition testimony, submitted to the district court below, confirms that the parties did not agree

to any standard terms or method for determining the terms of the "separate contract" under Section 4.  Mr. Leyerle testified at his deposition that when he executed the Propagation Agreement, he did so "with a lack of complete understanding of how the university intended to proceed or how they might actually proceed."  J.A. 231–32.  He also testified that he was "hamstrung by not understanding or having insight into how the university was proceeding."  J.A. 231.  Based on this evidence, no reasonable fact finder could conclude that parties understood that the "separate contract" in Section 4 would include the terms of the Form License.

Phytelligence also argues that WSU's "standard practice" creates a genuine factual dispute.  According to Phytelligence, WSU had previously undertaken a commercialization process with the WA 2 apple cultivar, which resulted in a set of standardized licensing terms.  Thus, Phytelligence argues, WSU had a "customary practice" in place to establish standard license terms for industry participants and that the "licensing program WSU implemented with respect to WA 38 was consistent with its customary practice [of] licensing other plant cultivars."  Appellant's Br. at 54–55.  We reject this argument.  Even assuming that WSU commercialized WA 38 based on this customary practice, Phytelligence fails to point to any evidence that the parties mutually agreed that Phytelligence would be entitled to any particular terms developed through this standardized process.  Thus, no reasonable fact finder could conclude that, based on WSU's alleged "standard practice," the parties understood that the "separate contract" under Section 4 would contain terms consistent with the Form License.  *See Plumbing Shop, Inc. v. Pitts*, 408 P.2d 382, 386 (Wash. 1965) (noting that by supplying all essential terms of an incomplete contract through "[b]usiness practice and custom," a court "would violate the elementary principle that [it] will not make a contract for the parties").

Lastly, Phytelligence argues that the parties' conduct following the execution of the Propagation Agreement creates a genuine factual dispute. We reject this argument. Post-execution, the evidence shows that the parties engaged in negotiations regarding Phytelligence's future license. Specifically, Phytelligence first discussed a future license with PVM, which required Phytelligence to become a member of NNII. Phytelligence rejected this offer. Phytelligence then communicated with WSU, noting it "believe[d] that § 4 . . . requires WSU . . . *to negotiate* with Phytelligence, in good faith, and *work out the terms and conditions of our option to propagate and sell WA-38.*" J.A. 165. (emphasis added). WSU subsequently offered to Phytelligence three different licensing options, two of which did not require Phytelligence to join NNII. However, Phytelligence rejected these options as well. Based on this evidence, no reasonable fact finder could conclude that, at the time of execution of the Propagation Agreement, the parties understood that there was "[n]othing . . . left for future negotiation" regarding the terms of Phytelligence's "separate contract" under Section 4.

To conclude, we recognize Phytelligence's desire to obtain a license to commercialize WA 38. But an enforceable right to that license does not reside within Section 4 of the Propagation Agreement. Courts are not in the business of making contracts. *Plumbing Shop*, 408 P.2d at 385. Here, Section 4 did not provide Phytelligence with a "separate contract" that contained sufficiently definite terms to be enforceable. Additionally, based on the extrinsic evidence, no reasonable fact finder could conclude that Section 4's "separate contract" would contain the terms in the Form License.

To hold otherwise would unfairly trap WSU with a surprise contractual obligation to grant Phytelligence a Form License that excludes the requirement of joining NNII—a requirement applicable to all other propagators. *See Keystone*, 94 P.2d at 949. Based on the face of Section 4, as

well as the extrinsic evidence, it is clear that Section 4 contained no such obligation.[3]

## CONCLUSION

We have considered Phytelligence's remaining arguments but find them unpersuasive. We affirm the district court's grant of summary judgment in favor of WSU.

**AFFIRMED**

---

[3]    Phytelligence also argues that the district court violated Federal Rule of Civil Procedure 56(f) to the extent that it stated that Phytelligence failed to show WSU's breach. Because we agree that the contract is unenforceable, we do not reach this question.