**WOLF BROS. OIL COMPANY, INC., a Washington corporation, Plaintiff,**

v.

**INTERNATIONAL SURPLUS LINES INSURANCE COMPANY, an Illinois corporation, Defendant.**

**No. C88–1560D.**

United States District Court, W.D. Washington, at Seattle.

July 27, 1989.

Bruce W. Hilyer, Culp, Guterson & Grader, Seattle, Wash., for Wolf Bros. Oil Co. Inc., plaintiff.

Scott M. Stickney, Bullivant, Houser, Bailey, Pendergross & Hoffman, Seattle, Wash. and Gregory J. DeGulis, Bivona & Cohen, New York City, for Intern. Surplus Lines Ins. Co., defendant.

## ORDER

DIMMICK, District Judge.

This diversity action is brought by plaintiff Wolf Bros. Oil Company against defendant International Surplus Lines Insurance Company (ISLIC) to recover the cost of environmental clean-up under a comprehensive pollution liability insurance policy. Plaintiff pleads multiple causes of action including breach of contract, estoppel, negligence, bad faith, and violation of the Washington Consumer Protection Act, RCW 19.86. Both parties have moved for issuance of a declaratory judgment establishing the extent of coverage under the policy. In addition, plaintiff moves for partial summary judgment establishing violation of the Washington Consumer Protection Act. Defendant moves for summary judgment on all claims.

This Court, after considering the parties' supporting memoranda and affidavits, and after hearing oral argument, finds that defendant is entitled to judgment as a matter of law declaring its non-liability under the contract. The Court further finds that defendant violated the Washington Consumer Protection Act, RCW 19.86, and grants par-

tial summary judgment to plaintiff on that issue.

## I. BACKGROUND

Plaintiff Wolf Bros. operated a chain of gasoline stations for which it maintained a pollution liability insurance policy through ISLIC. It was a "claims made" policy,[1] providing coverage for third-party claims of bodily injury and property damage brought against the policyholder. The policy also provided for reimbursement of the policyholder for costs incurred pursuant to governmentally-mandated clean-up of environmental damage pursuant to a pollution incident.

At the expiration of the policy term, ISLIC declined to renew the policy, and Wolf Bros. exercised its option under the contract to purchase an extended reporting period. After the expiration of the main policy, but within the term of the extended reporting period, plaintiff confirmed the presence of environmental contamination at one of its sites. Also during the extended reporting period, the Department of Ecology mandated clean-up of that site pursuant to CERCLA. Immediately thereafter plaintiff filed a claim for property and environmental damage with ISLIC.

Plaintiff asserts that swift remedial action was required to prevent the further spread of environmental contamination and to mitigate the costs of clean-up. It appears that plaintiff repeatedly expressed to its insurer the urgency of the situation and requested prompt affirmation of coverage. It further appears that ISLIC delayed, without explanation, in resolving the claim for a period of approximately five months. In the meantime, plaintiff went forward with clean-up operations, incurring a cost of approximately $85,000. Subsequently, and only after intervention by the Insurance Commissioner, ISLIC responded to the claim, denying all coverage for clean-up costs.

## II. COVERAGE UNDER THE POLICY

### A. The Issue of Ambiguity

Plaintiff asserts that the policy is ambiguous with regard to the effect of the extended reporting period (ERP) clause on its liability for clean-up costs and that such ambiguity must be resolved in its favor. Defendant maintains that the unambiguous meaning of the provision fails to extend the period of coverage for clean-up costs and that the plain meaning must control.

[1] The Washington Supreme Court recently articulated the rules of construction applicable to insurance contracts. Where the contract language is clear and unambiguous, it must be enforced as written. *Washington Public Util. Dist. Util. System v. Public Util. Dist. 1,* 112 Wash.2d 1, 10, 771 P.2d 701 (1989). Where, however, the contract language *"on its face* is fairly susceptible to two different but reasonable interpretations," the contract is deemed ambiguous and extrinsic evidence of the parties' intent is admitted for the purpose of resolving the ambiguity. *Id.* at 11, 771 P.2d 701 (emphasis in original). Only if the ambiguity remains after consideration of extrinsic evidence will the Court apply the rule requiring construction in favor of the insured. *Id.; Transcontinental Ins. Co. v. Washington Public Util. Dist. Util. System,* 111 Wash.2d 452, 456–57, 760 P.2d 337 (1988).

Plaintiff's interpretation of the ERP provision would have the clause extend the "policy period" (referenced in Clause IB) during which governmental action may commence in order to give rise to an insurable claim for clean-up costs.[2] Plaintiff

---

1. A "claims made" liability policy is one wherein the insurer agrees to cover third-party claims so long as they are brought against the policyholder during the policy period. Such policies often also require that the subsequent claim against the insurer be brought within the policy period. *See generally* Comment, *The "Claims Made" Dilemma in Professional Liability Insurance,* 22 U.C.L.A. L. Rev. 925 (1975).

2. The pertinent portions of the insurance contract follow:

"I. POLLUTION LIABILITY COVERAGE
"A. The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as compensatory damages because of bodily injury or property damage to which this insurance applies, provided that:

bases this interpretation on (1) its reasonable expectation of coverage in light of the purpose of an extended reporting provision, on (2) the contract's failure to expressly exclude extended coverage for clean-up costs, and on (3) the inherent structural confusion of the contract. In the alternative, plaintiff suggests that the ERP provision for "property damage" may reasonably be construed to encompass environmental clean-up costs.

■ There is no merit to plaintiff's contention that the contract is reasonably susceptible to its divergent interpretation. First, plaintiff's reliance on "reasonable expectations" would have the Court look beyond the four corners of the document to find external evidence of ambiguity. Such an inquiry would contravene the "plain meaning" rule expounded in *Washington Public Util. Dist., supra.* Furthermore, such an approach was expressly rejected in *State Farm Gen. Ins. Co. v. Emerson,* 102 Wash.2d 477, 687 P.2d 1139 (1984), where the Court reasoned that the facial absence of ambiguity precluded, by its terms, a finding of reasonable expectation.

Second, plaintiff is misguided in its argument that ambiguity is created by the contract's failure to expressly exclude extended coverage for clean-up costs. Plaintiff

relies primarily on the case of *Dairyland Ins. Co. v. Ward,* 83 Wash.2d 353, 359, 517 P.2d 966 (1974) for the proposition that a policy exclusion, in order to be effective, must be brought clearly to the attention of the insured. However, the ambiguity found by the court in *Dairyland* involved an exclusionary clause "sandwiched" into the general coverage provisions and not otherwise referenced in the Exclusions section of the contract. The instant case is distinguishable inasmuch as it does not involve the effect of an exclusionary clause *per se.* On the contrary, the ERP option amounts to an affirmative grant of coverage that by its terms is more limited than the coverage provided during the main policy period. Therefore, the contract's failure to specifically exclude coverage for clean-up costs during the extended reporting period does not invite alternative reasonable interpretations and hence does not create ambiguity.

Plaintiff cites additional authority for the related proposition that a reduction in coverage must be brought emphatically to the attention of the insured. However, the cases relied upon by plaintiff involve subsequent reductions in coverage pursuant to contract renewals. In the instant case, even if we were to characterize the effect

(1) such bodily injury or property damage is caused by a pollution incident which commences subsequent to the retroactive date shown in the declarations of this policy; and (2) the claim for such damages is first made against the insured during the policy period and reported to the company during the policy period or within fifteen days after its termination.
"A claim shall be deemed to have been made only when suit is brought or written notice of such claim is received by the insured.

. . . .

"B. The company will reimburse the insured for reasonable and necessary clean-up costs incurred by the insured in the discharge of a legal obligation validly imposed through governmental action which is initiated during the policy period, provided that:
(1) such clean-up costs are incurred because of environmental damage to which this insurance applies; and
(2) the environmental damage is caused by a pollution incident which commences subsequent to the retroactive date shown in the declarations of this policy.

* * * * * *

"V. EXTENDED REPORTING PERIOD OPTION
"If, for any reason other than non-payment of premium, the company cancels or refuses to renew this policy, the named insured may

. . . .

(2) by paying promptly when due an additional premium of not more than 50% of the annual premium developed under this policy, have an endorsement issued providing an extended reporting period of one year following the effective date of the cancellation or non-renewal. Any claims for damages because of bodily injury or property damage first made against the insured and reported to the company during that extended reporting period shall be deemed to be so made and reported during the policy period, but only if the bodily injury or property damage occurred prior to the effective date of the cancellation or non-renewal. All other provisions of this policy, including those relating to the company's limit of liability, shall be unchanged by this provision."

of the ERP option as a "reduction," the terms of that option were patent and operative from the contract's inception and therefore posed no comparable problem of assent. Thus, the contract's failure to emphasize the limited coverage conferred by the ERP does not create ambiguity.

Third, plaintiff's argument that the policy's inherent structural confusion creates ambiguity is without merit. Although the policy requires the reader to cross-reference provisions found in various sections of the contract, the structure is a logical and accessible one. Even if plaintiff's characterization of the policy as a "scavenger hunt" were *apropos*, there is no authority to the effect that structural complexity is tantamount to structural ambiguity. Indeed, the Washington Supreme Court in *Washington Public Util Dist., supra,* declined to find structural ambiguity in a contract that was regarded structurally confusing because the pertinent policy language was not found on a single page.

 An examination of a specific contractual provision for the purpose of ascertaining its meaning requires contextual reference to the document as a whole. *Morgan v. Prudential Ins. Co. of America,* 86 Wash.2d 432, 545 P.2d 1193 (1976). Considering this contract as a whole, the interpretation of the ERP urged by plaintiff—i.e., that the effect of the ERP is to extend the applicable "policy period" for all three classes of occurrences—is untenable. First, the general provisions of Clause IA and IB establish from the outset the bifurcated treatment of clean-up costs on one hand and of bodily injury and property damage on the other. Coverage for bodily injury and property damage (Clause IA) is triggered by the reporting of both third and first-party claims within the policy period. In contrast, coverage for clean-up costs (Clause IB) is triggered solely by the commencement of governmental action during the policy period. This basic distinction in coverage between these two major classes of events permeates the body of the contract.

Second, the ERP option clause at no point states a general provision of extended coverage. On the contrary, the sole description of the effect of ERP coverage is to extend the applicable "policy period" for claims of bodily injury and property damage. There is no additional language that would imply extension of the policy period with regard to all three classes of incidents covered during the policy-in-chief. Furthermore, the provision that "[a]ll other provisions ... shall be unchanged" (*cf.* "all other *coverage* shall be unchanged") would suggest that the triggering scheme initially set out in Clause IB referring to clean-up costs is not modified by the ERP provision.

Third, an extended reporting period *per se* is logically incongruous with the basic "triggering" provision applicable to clean-up costs. The insurer's liability for clean-up costs is premised solely on when governmental action is initiated, there being no independent restriction on when the claim against the insurer is reported. Therefore, to construe the ERP clause as extending the *reporting* period for such claims would render the clause nonsensical and ineffective. Indeed, the Court in *E–Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.,* 106 Wash.2d 901, 726 P.2d 439 (1986), held that contract provisions must be given a "fair, reasonable and sensible construction," not one that is "forced or strained" or that leads to an "absurd or ineffective" result. The only meaningful effect that an extending provision could possibly have on such claims is to extend the time during which *governmental action* could commence to trigger the insurer's liability. The latter interpretation unduly strains the plain meaning of the contract.

Even if this Court were to find the contract ambiguous on its face, it must proceed to examine extrinsic evidence in an effort to resolve the ambiguity before automatically construing the policy in favor of the insured. *Transcontinental Ins. Co. v. Washington Public Util. Dist. Util. System,* 111 Wash.2d 452, 760 P.2d 337 (1988); *Greer v. Northwestern Nat'l Ins. Co.,* 109 Wash.2d 191, 201, 743 P.2d 1244 (1987). This examination entails an inquiry into the purpose, objective, and subject matter of the contract, and into the circumstances of

its making, the subsequent conduct of the parties, and the reasonableness of their respective interpretations. *Washington Public Util Dist.*, 112 Wash.2d at 11, 771 P.2d 701.

This inquiry is initially enlightened by reference to the purpose and objectives of a "claims made" policy. A "claims made" policy is intentionally designed to limit the insurer's risk in underwriting certain potentially high-liability policies while providing the policyholder relatively broader coverage at a lower price.[3] "Claims made" policies are standard in many areas of high-risk liability insurance where coverage has become difficult to obtain except at very high rates. "Claims made" policies are rarely issued to the uninitiated.

The record suggests that Wolf Bros. was hardly an unsophisticated purchaser of insurance and that it was aware of the current crisis in pollution liability insurance and of the increasingly limited scope of such policies.[4] Undoubtedly it was further aware that the policy it had purchased was a "claims made" policy.[5] In short, Wolf Bros. had every reason to expect severe limitations on its coverage. Furthermore, with respect to the extended reporting option in particular, Wolf Bros. received specific advisement in its notice of non-renewal that it should consult its broker and/or attorney regarding exercise of that option. Under these circumstances, Wolf Bros' allegedly reasonable expectation of coverage under the ERP should warrant more exact-ing scrutiny than that ordinarily applied to non-commercial consumers of insurance. Accordingly, the plain meaning of the contract should defeat its subjective expectation of coverage.

The policy price is another extrinsic factor that is probative of the *ex ante* intent of the contracting parties. Plaintiff obtained the ERP option for roughly one-half of the price that it paid for regular policy coverage for a period of equal duration. From this disparity alone it is obvious that the risks anticipated by the ERP option were not identical to those anticipated by the policy-in-chief. ISLIC apparently intended to limit its risk during the extended reporting period by disallowing coverage for any new third-party claims brought against the policyholder during that period. Plaintiff's vision of an extended period for issuance of a government clean-up mandate is fundamentally inconsistent with that intention. Therefore, plaintiff's interpretation cannot be reconciled with the limited risk evinced by the ERP price.

The purpose of an extended reporting period option is another extrinsic factor probative of the parties' intent. One major reason that insurers include ERP option clauses in certain "claims made" contracts similar to the one at bar is to avoid the risk of unenforceability resulting from the perceived oppressiveness of the reporting restrictions.[6] From this it is readily inferable

---

**3.** Because only claims brought during a defined period are covered, the insurer avoids the uncertainty of the open-ended "tail" period that characterizes occurrence policies. The insurer is able to provide relatively broader coverage (e.g., retroactive coverage for occurrences prior to the policy period) at a lower rate because the insurer can establish his reserves without compensating for future contingencies such as inflation, changes in the legal definition of liability, and magnification of jury awards. *See* Comment, *The "Claims Made" Dilemma in Professional Liability Insurance,* 22 U.C.L.A. L. Rev. 925 (1975).

**4.** Vice–President Richard Wolf states in his affidavit that he was president of the Washington Oil Marketer Association and of the Pacific Oil Conference, both wholesale oil trade corporations. This fact would tend to imply that Wolf

Bros. was no novice to the business of pollution liability.

**5.** Both the application for insurance and the policy itself provided conspicuous warning that this was a "claims made" policy.

**6.** In *Brown–Spaulding & Assoc. v. Intl. Surplus Lines,* 206 Cal.App.3d 1441, 254 Cal.Rptr. 192 (1988), the California court struck down a "claims made" policy that required both first and third-party claims to be reported during the policy period. The Court held the policy to be unreasonably and unexpectedly restrictive with respect to coverage for third-party claims brought at or near the end of the policy period which may not reasonably be reportable until after the policy has expired. *See also Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 495 A.2d 406, 414–15 (1985). The court in *Brown–Spaulding*

that ISLIC provided for an extended reporting period because it had to. It was, however, under no similar constraint to provide extended reporting for clean-up claims, since those claims already could be reported at any time. Therefore, extrinsic evidence again suggests that the parties in the instant case were not bargaining *ex ante* for an extension of the time during which a governmental mandate for environmental clean-up could issue.[7]

## B. Clean-up Costs as Property Damage

■ Plaintiff alternatively maintains that its clean-up costs are covered within the term of the ERP under the provision for "property damage." "Property damage" is broadly defined in the Definitions section of the contract to include "contamination" and "loss of use ... because of a pollution incident.". However, to conclude that clean-up costs are contemplated by this definition ignores the patent distinction—permeating the body of the contract—between clean-up costs, property damage, and bodily injury as three distinct types of occurrence.

Moreover, even if the Court were to grant that clean-up costs are encompassed within the ERP provision for "property damage," the contract contains an exclusion for damage to property owned or used by the insured, "except as provided in I. POLLUTION LIABILITY COVERAGE B."

(referring to coverage for clean-up costs incurred pursuant to governmental action commencing during the policy period).[8] Therefore, the denomination of clean-up costs as property damage will not rescue a clean-up claim which by the terms of the policy either is excluded or else is governed by the basic provision set out in Clause IB.

## C. The Check Notation as Modification

■ Plaintiff contends that even if the policy is construed against it, a notation inscribed on its ERP premium check operates as a subsequent modification of its agreement with ISLIC. The check notation read: "Premium for extended reporting period extending identical coverages as the underlying policy for claim [sic] made through 10/1/88." Plaintiff supports this argument with the general theory that parties to a contract are free to modify their agreement by offer and acceptance.

There is no merit to plaintiff's argument. First, Clause 7 of the Conditions section of the contract precludes subsequent modifications that are not made a part of the policy by endorsement. However, even in the absence of Clause 7, it is untenable that a contract modification could arise under the facts presented. Although no cases from this jurisdiction appear to have addressed this fact pattern, U.C.C. § 2–207, by analogy, along with general principles of offer and acceptance answer the ques-

clearly distinguished its case from others in which the policy provided for an extended reporting option, thus implying that an ERP provision would mitigate the harsh effect of an otherwise unconscionable bargain. *Brown–Spaulding*, 254 Cal.Rptr. at 197.

7. Plaintiff would also have the Court look to evidence that the ERP premium check was inscribed with a notation evincing plaintiff's understanding of the coverage provided by the ERP option. However, far from being evidence of common intent, the check notation is probative only with regard to plaintiff's understanding of that clause. Actual or constructive knowledge of that understanding cannot be logically imputed to ISLIC. See page 845 *infra*.

8. The policy states:
EXCLUSIONS
This insurance does not apply:
. . . . .

(e) except as provided in I. POLLUTION LIABILITY COVERAGE B., to property damage or environmental damage to
(1) an insured site, or
(2) property owned or occupied by or rented to the insured, or
(3) property used by the insured, or
(4) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;
. . . . .
It is further understood and agreed that the following exclusions are added to the policy:
(q) to bodily injury, property damage or environmental damage arising out of
. . . . .
(2) any condition or circumstance that gives rise to a claim that was known by the insured and not disclosed to the Company in the original policy application form and any subsequent renewal policy application forms thereof.

tion satisfactorily. Under U.C.C. § 2–207, an acceptance varying the terms of an offer operates to create a contract on the offeror's terms, and the divergent terms of the acceptance act merely as counteroffers. Only between merchants do the divergent terms automatically become part of the contract, and even then, only if they are not material ones. In all other cases, absorption of a proposed modification requires a manifestation of assent to be bound to the new terms. In the instant case, ISLIC's mere silence in the face of a proposed modification cannot amount to such assent since it would be unreasonable to shift the burden of expression to a corporation that by all appearances did not have even constructive knowledge of plaintiff's "counteroffer." [9]

### III. ESTOPPEL

Plaintiff urges that ISLIC be estopped to disavow coverage inasmuch as its unreasonable delay in responding to the claim created in plaintiff the reasonable expectation of coverage. [10]

■ In general, a claim of estoppel requires (1) an admission, statement, or act amounting to a representation inconsistent with a later claim, (2) foreseeable and reasonable reliance on that representation, and (3) injury caused by a change in position induced by that reliance. *See Harbor Air v. Board of Tax Appeals*, 88 Wash.2d 359, 560 P.2d 1145 (1977); *Marsh v. General Adjustment Bureau*, 22 Wash.App. 933, 592 P.2d 676 (1979).

■ Plaintiff first notified ISLIC of its claim on May 10, 1988. ISLIC began its investigation in early June, assigned an adjustor in early July, and finally denied coverage on October 17, 1988. This amounted to a completed response time of approximately five months. [11] During that time, plaintiff's attorney directed five consecutive letters to ISLIC, emphasizing the urgent need for response and finally informing ISLIC that clean-up operations had begun.

While there appears to be no authority directly on point, logic would dictate that even a lengthy delay in resolving an insurance claim could not, in the absence of other factors, amount to a representation of coverage. Whether such a representation was subsequently created when plaintiff indicated by letter to ISLIC that it was beginning clean-up is less clear. The letter did not indicate that the clean-up was being undertaken "in reliance .on" a representation of coverage; if it had, defendant's silence might have amounted to a ratification of coverage. As it stands, however, defendant seems merely to have ignored plaintiff's requests, and its failure to respond probably could not have induced reasonable reliance.

More importantly, even if the elements of representation and reasonable reliance were granted, the question would remain whether ISLIC's delay was the actual cause of plaintiff's injury. Plaintiff alleges that because of the reasonable appearance

---

9. Furthermore, Plaintiff's argument is a double-edged sword: Its alleged intent to effect a modification of the contract undermines its former contention that it reasonably construed the contract to provide for a generalized extension of coverage.

10. Plaintiff also contends that it received encouragement to proceed with clean-up operations from the agents of ISLIC, and that such encouragement amounted to an affirmative representation of coverage. Plaintiff does not indicate in its memorandum exactly what statements it is referring to. Probably plaintiff is referring in part to an in-house statement made by an employee of ISLIC's managing corporation regarding the coverage available under the ERP—a statement in which he uses the term "all claims." However, aside from the fact that the

statement appears to have been made casually and not intended to represent coverage to anyone, it is not clear that plaintiff was even aware of the statement prior to the onset of litigation. Plaintiff appears also to be referring to a statement made by ISLIC's independently retained adjustor who at one point indicated concurrence with plaintiff's clean-up plan. Likewise there appears no evidence in the record to suggest that the adjustor was representing anything, and there is furthermore no evidence of even an apparent agency.

11. It should be noted, however, that Plaintiff was not in receipt of a DOE clean-up directive until at least June 24, a fact that would tend to decrease somewhat the period of unexplained delay.

of coverage, it was caused to forego its right to contest the DOE's authority and jurisdiction with regard to its clean-up directive. However, plaintiff fails to provide evidence that it had any colorable ground on which to challenge the mandate. Furthermore, whether contest of the mandate would have resulted in suspension of plaintiff's liability for clean-up is entirely speculative. Finally, it is not at all clear that plaintiff would not have undertaken clean-up in any event, particularly in light of what plaintiff admits was an imminent potential for significant expansion of the contamination. Accordingly, plaintiff has failed to show its entitlement to judgment as a matter of law.

## IV. VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT

■ Plaintiff alleges that ISLIC violated the Washington Consumer Protection Act, RCW 19.86, by its inordinant delay in responding to Wolf Bros.' claim. Plaintiff's related claims for bad faith and negligence are supported by the same basic set of facts.

The limited facts presented regarding ISLIC's resolution of the claim are essentially undisputed. Between the time plaintiff informed ISLIC of its claim on May 10, 1988, plaintiff, through its attorney, sent five consecutive letters to ISLIC, repeatedly expressing an urgent need for approval to proceed with clean-up operations. It was not until five months later, on October 14, 1988—and then only after intercession by the Insurance Commissioner—that ISLIC finally responded to the claim.[12] Defendant provides no explanation for its lengthy delay.

RCW 19.86.020 of the Washington Consumer Protection Act declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The deceptive act or practice element of a CPA claim can be satisfied *per se* by proof that the defen-

dant has violated a statute by which the legislature has declared a particular practice to be unfair or deceptive. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 719 P.2d 531 (1986). Such a statute, specifically pertaining to the conduct of insurers, is set out in WAC 284–30–330.[13] That section declares, *inter alia*, the following to be unfair or deceptive acts or practices:

> (2) Failing to acknowledge or act reasonably promptly upon communications with respect to claims arising under insurance policies.

. . . . .

> (5) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.

RCW 48.30.010.

In addition, WAC 284–30–370 defines the standard of prompt investigation of claims:

> Every insurer shall complete investigation of a claim within thirty days after notification of claim, unless such investigation cannot reasonably be completed within such time....

WAC 284–30–370. Finally, WAC 284–30–380 provides the standard for prompt, fair, and equitable settlement:

> Within fifteen working days after receipt by the insurer of properly executed proofs of loss, the first party claimant shall be advised of the acceptance or denial of the claim by the insurer.... If the insurer needs more time to determine whether a first party claim should be accepted or denied, it shall so notify the first party claimant *within fifteen working days* after receipt of the proofs of loss giving the reasons more time is needed. If the investigation remains incomplete, the insurer shall, *within forty-five days* from the date of the initial notification and no later than every thirty days thereafter, send to such claimant

12. Plaintiff alleges that deposition testimony by ISLIC's broker establishes that Defendant nonetheless had all the information it needed to resolve the claim at least one month prior to its notification of Plaintiff.

13. Legislative competence is conferred to the administrative agency by RCW 48.30.010.

a letter setting forth the reasons additional time is needed for investigation. . . .

WAC 284–30–380 (emphasis added).

Plaintiff has adduced prima facie evidence that defendant, by its delay and lack of notification, violated WAC 284–30–370 and WAC 284–30–380. Because defendant has brought forward insufficient evidence to rebut either the contention of lack of proper notification or that of the unreasonableness of its conduct, plaintiff is entitled to judgment as a matter of law establishing violation of the Consumer Protection Act. The issue whether plaintiff has met the elements of a civil cause of action based upon violation of the Act is reserved for trial. Summary judgment on the claims of negligence and bad faith is precluded by material questions of fact surrounding the issue of causation and damages. *See* discussion regarding estoppel, *supra.*

## CONCLUSION

NOW, THEREFORE, the Court hereby enters a declaration that the costs of environmental clean-up mandated during the extended reporting period are not covered under the extended reporting option of the contract.

Furthermore, because defendant has failed to come forward with evidence showing its delay to have been reasonable, the Court finds defendant to have violated the Washington Consumer Protection Act, RCW 19.86, and GRANTS summary judgment to plaintiff on that issue.

The parties' motions for summary judgment on the claim of estoppel, and defendant's motion for summary judgment on the bad faith and negligence claims, are hereby DENIED.