682 So.2d 620 (1996)
UNITED STATES FIRE INSURANCE CO., Appellant,
v.
Norman FLEEKOP, Rhonda Fleekop, Jay W. Weiss, Elliott Dinnerstein, Morton Levin, and Richard Myers, Appellees.
Nos. 95-1480, 95-1726.
District Court of Appeal of Florida, Third District.
October 30, 1996.
*621 Stephens, Lynn, Klein & McNicholas, P.A. and Gary Khutorsky and Philip D. Parrish, Miami, for appellant.
Andrew Hall & Associates, P.A. and Andrew C. Hall and Christopher J. Dawes, Miami, for appellees Norman Fleekop, Rhonda Fleekop, Jay W. Weiss, and Elliott Dinnerstein.
Semet, Lickstein, Morgenstern, Berger, Friend, Brooke & Gordon, P.A. and Paul S. Berger and David Friedman, for appellees Morton Levin and Richard Myers.
Before JORGENSON, GODERICH and GREEN, JJ.
GREEN, Judge.
At issue in the declaratory action below was the construction of an excess professional liability policy issued by appellant United States Fire Insurance Company ("U.S. Fire") to the accounting firm of Sadoff, Rothchild, Levin & Meyers, P.A. ("P.A."). U.S. Fire appeals adverse summary judgments finding it obligated to defend the P.A. for claims filed by appellees, Norman and Rhonda Fleekop, Jay Weiss, and Elliott Dinnerstein, all of *622 whom are former clients of the P.A.[1] and to provide coverage if such claims are ultimately successful. Specifically, the court below found that: (1) there was excess coverage for notice of potential claims given during the "tail" period of the policy; and (2) the notice given to U.S. Fire by the P.A. was sufficient to trigger the coverage. We affirm.

I
During the relevant time period, the P.A. performed professional accounting services throughout South Florida. As part of its practice, the P.A. promoted to the Fleekops, Weiss, Dinnerstein and other clients a series of purported tax shelters established by Investex, Inc., a Florida land sales business. The P.A., through partner Milton Sadoff, advised its clients for tax reasons to join partnerships which were then in the business of purchasing land from Investex. Investex's scheme of installment land sales on commission caused the participating partnerships to incur annual losses and expenses which could, in turn, be used as tax deductions by the investing clients.
In 1984, however, these Investex partnerships came under scrutiny and investigation by the Internal Revenue Service. This investigation culminated in a 1989 decision of the United States Tax Court[2] which upheld the I.R.S.'s disallowance of the deductions claimed by the partnerships. The I.R.S.'s disallowance of these deductions resulted in substantial tax penalties and payments for the P.A.'s clients. Some of the P.A.'s clients took legal action against the P.A. for professional malpractice.[3]
The P.A.'s primary professional liability policy was for $5 million and was issued through North River Insurance Company ("North River"). The policy provided a "claims-made" type coverage. "Claims-made" policies, as opposed to "occurrence" policies, trigger coverage "if the negligent or omitted act is discovered and brought to the attention of the insurer within the policy term." Gulf Ins. Co. v. Dolan, Fertig & Curtis, 433 So.2d 512, 514 (Fla.1983) (quoting 7A Appleman, Insurance Law & Practice § 4504.01 at 312 (Berdal ed. 1979)); see also Ranger Ins. Co. v. United States Fire Ins. Co., 350 So.2d 570, 572-73 (Fla. 3d DCA 1977) (outlining the distinction between types of policies). "Occurrence" policies, on the other hand, trigger the carrier's liability if the error or omission occurs during the period of policy coverage, "regardless of the date of discovery or the date the claim is made or asserted." Gulf Ins. Co., 433 So.2d at 514.
The P.A. also purchased $10 million worth of "excess" or additional errors and omissions coverage from U.S. Fire. This was an excess "following form" policy, meaning that U.S. Fire was bound by the terms of the underlying policy with North River. U.S. Fire as the excess carrier was also bound by notice given to North River as primary carrier. Here, both carriers happened to use the same claims processing managers, Crum & Forster Managers, Inc. ("Crum & Forster").
Originally, the P.A.'s policies with North River and U.S. Fire were to run from August 31, 1984 until August 31, 1985.[4] The P.A., however, elected to extend its existing policy in favor of a "tail" or discovery policy pursuant to the following provision in the initial policy (emphasis ours):

*623 Excess Following Extended Reporting Period

In consideration of an additional premium of $2,500, the excess errors & omissions/professional liability endorsement... is extended to apply in accordance with Condition II of the underlying account's professional liability policy ... issued by the North River Ins. Co. for the extended reporting period of:

October 1, 1984 to October 1, 1990
* * * * * *
The relevant conditions of the policy at issue are as follows:

Conditions

I. Policy Period and Claims-Made Provisions
This policy applies to acts, errors or omissions in the Insured's performance of professional accounting services provided that the claim is first made during the policy period and written notice of said claim is received by the Company during the policy period.

If during the policy period, the Company shall receive written notice of an act, error or omission which could reasonably be expected to give rise to a claim against the Insured under this policy, any claim which subsequently arises out of such act, error or omission shall be considered a claim first made against the Insured during the policy year in which the written notice was received.

II. Extended Reporting Period
* * * * * *
(b) If the Named Insured cancels or elects not to renew this policy, the Named Insured shall have the right, upon a single payment of an additional premium of 50% of the last annual premium, to an extension of the coverage granted by this policy in respect to acts, errors or omissions in professional accounting services performed prior to the end of the policy period, provided that the claim is first made against the insured for said acts, errors, or omissions, during the period of six (6) years following the date of cancellation or nonrenewal and written notice of such claim is received by the Company during such period.
"Tail" or discovery period coverage essentially supplements a claims-made policy to give the insured added protection. See Arad v. Caduceus Self Ins. Fund, Inc., 585 So.2d 1000, 1001 (Fla. 4th DCA 1991) ("[Tail coverage] protects [insureds] into the future for claims regarding incidents that occurred during the policy period but which were not presented until after the policy expired."); American Casualty Co. v. Rahn, 854 F.Supp. 492, 501 (W.D.Mich.1994) ("In effect, [tail coverage] provide[s] an extended period during which the insured may `discover' the existence of a claim based on the prior conduct."). The logic of such policies is that an act of malpractice might not be discovered until after the original policy period had terminated, at which time the insured would be completely vulnerable to suit. Tail coverage picks up where the claims-made policy leaves off, with respect to acts committed during the original policy period. Tail coverage does not provide indemnity for new negligent acts or omissions committed during the tail period. Tail coverage is what the P.A. purchased for the period of October 1, 1984 through October 1, 1990. The endorsement for the tail or discovery policy specifically stated that "all other terms and conditions of this policy remained unchanged."
When the P.A.'s former clients began to file their initial lawsuits in 1987, North River defended and settled all of such suits except onebecause of the exhaustion of the primary policy limits. At that point, U.S. Fire stepped in to defend this remaining suit. Appellees point out that, in defending this suit, U.S. Fire became intimately familiar early on with the facts surrounding these failed tax shelters.
On January 4, 1990, North River's agent wrote the P.A. to remind the firm, among other things, of the impending October 1, 1990 expiration of the tail or extended reporting period and to request a list of similarly situated clients who were likely to sue *624 the P.A. for malpractice arising out of the failed Investex's tax shelter matter.[5]
In response, on September 21, 1990, and before the extended reporting period expired, the P.A.'s counsel notified U.S. Fire in writing of the names of 700 individuals and/or entities who had reason to sue the P.A. because of the Investex matter. Additionally, the P.A. directed their carriers to consider its letter as a claim made under each of the policies and to advise if any additional information was required.[6] The names of the appellees, Norman Fleekop, Rhonda Fleekop, Jay W. Weiss and Elliott Dinnerstein, were included as potential claimants on the September 21, 1990 list. Although invited to do so by the P.A.'s counsel, U.S. Fire requested no further information about the 700 potential claimants included on the list nor did U.S. Fire advise the P.A. that the September 21, 1990 letter was insufficient notice. Moreover, U.S. Fire asserted no coverage defense to any of the potential claimants listed on the September 21, 1990 list upon its immediate receipt of the same.
The extended reporting period or tail period then expired on October 1, 1990. On November 6, 1990, Crum & Forster, still processing claims for both North River and U.S. Fire, assigned a claim number to the P.A.'s September 21, 1990 list of potential claimants. Thereafter, on November 30, 1990, North River notified the P.A.'s counsel of the exhaustion of the primary policy limits and advised that all future correspondences should continue to be sent to Crum & Forster, but now in its capacity as managing agent for U.S. Fire.

II
In June of 1991, the P.A. was sued by appellees Norman and Rhonda Fleekop. Like others before them, the Fleekops alleged that they incurred tax penalties as a result of the firm's advice regarding the Investex partnerships. In July 1991, appellees Jay Weiss and Elliott Dinnerstein also sued the P.A., on those grounds. The Fleekops, Dinnerstein, and Weiss turned out to be the last set of parties to sue the P.A. over the Investex matter.
On July 24, 1991, U.S. Fire sent the P.A. a letter in which it denied for the first time coverage in the Fleekop lawsuit. In that letter, the U.S. Fire representative explained that the September 21, 1990 letter had only provided notice of "potential" rather than actual claims and was insufficient to meet the reporting requirements of the tail policy. The Fleekops' summons and complaint were not served until January 8, 1991 and thus after the expiration of the tail period; U.S. Fire therefore asserted that it had no duty to defend or provide coverage for this claim. U.S. Fire similarly denied any coverage in the Weiss and Dinnerstein cases.
While these malpractice cases were pending in 1992, this declaratory action was initiated *625 against U.S. Fire. The trial court decided as a matter of law that the same notice requirements present during the regular policy period applied to the tail or extended reporting period. The trial court also ruled that the September 21, 1990 letter constituted sufficient notice of a claim to trigger coverage under the extended reporting period. This appeal followed.

III
It is undisputed on this appeal that coverage would have been triggered during the original policy period (i.e. August 31, 1984 through August 31, 1985) by the P.A.'s mere notice of an occurrence. In other words, the P.A.'s notification to its carrier of a mere potential claim would have sufficed; Condition I of the policy makes this clear. Where the parties disagree in their respective interpretations of this policy is whether coverage would have similarly been triggered during the tail or extended reporting period of the policy (i.e. October 1, 1984 through October 1, 1990) by the P.A.'s mere notice of a potential claim or an occurrence.
U.S. Fire contends that the term "claims" as defined in Condition I is inapplicable to the tail or extended reporting period provision contained in Condition II. According to U.S. Fire, a "claim" for which coverage is triggered during the tail period means an actual rather than potential lawsuit filed against the P.A. during this period. Consequently, since the lawsuits brought by the Fleekops, Jay W. Weiss, and Elliott Dinnerstein were not filed until after the expiration of the tail period (i.e. October 1, 1990), U.S. Fire maintains that is has no duty to defend or provide coverage for these claims.
Appellees counter that the term "claim" as defined in Condition I is equally applicable to the tail or extended reporting period since this term has not been redefined or limited by the carrier in Condition II. At the very least, appellees argue that the term "claim" is ambiguous for the tail period and as such, they must prevail on this basis alone.
The question of whether an insured's notice of an occurrence or potential claim to the insurer during the tail period is sufficient to trigger coverage is one of first impression in Florida. In those jurisdictions which have squarely addressed this question, there is a split of authority.[7] The diametrically opposing views appear to be the result of different approaches to the question.
Most of the courts which have addressed the issue thus far have adopted the argument advanced by U.S. Fire and held that tail coverage is triggered only by notice of an actual rather than potential claim against the insured during this period. American Casualty Co. v. Baker, 22 F.3d 880 (9th Cir.1994) (construing California law); American Casualty Co. v. FDIC, 999 F.2d 480 (10th Cir. 1993) (Wyoming law); American Casualty Co. v. FDIC ("Wilkinson"), 958 F.2d 324 (10th Cir.1992) (Oklahoma law); American Casualty Co. v. RTC ("Baltimore Federal"), 845 F.Supp. 318 (D.Md.1993); FDIC v. American Casualty Co., 528 N.W.2d 605 (Iowa 1995). These courts reach this conclusion based upon their emphasis on a distinction made in the coverage clause between the main policy period and discovery or tail period:
Given the clear dichotomy drawn in [the Coverage Clause] between the "policy period" and the "discovery period," coupled with reference in the same clause to the nature of notice that can be given during the policy period under [the Notice of Claims Clause], we cannot conclude that the term "policy period"as used in both [the Notice of Claims Clause] and [the Coverage Clause]may reasonably be interpreted to encompass the "discovery period."
Baker, 22 F.3d at 889 (alteration in original) (citing Wilkinson, 958 F.2d at 327). Baker, in turn, relies on language from Baltimore Federal:
The plain language of [the Discovery Clause]"any claim or claims which shall be made"precludes coverage based on mere notice of potential claims. This is confirmed by a careful reading of the unambiguous *626 language in [the Notice of Claims Clause], requiring that notice of potential claims be given "during the policy period," and [the Coverage Clause], distinguishing between "the policy period" and "the discovery period."
22 F.3d at 889 (alteration in original) (quoting Baltimore Federal, 845 F.Supp. at 325-26). Some of these courts have additionally pointed to the disparity in premiums paid for the main and tail policies as support for their view that tail coverage is not triggered by notice of a potential claim. E.g., Wolf Bros. Oil Co. v. International Surplus Lines Ins. Co., 718 F.Supp. 839, 844 (W.D.Wash.1989) ("From this disparity alone it is obvious that the risks anticipated by the [extended reporting period] option were not identical to those anticipated by the policy-in-chief."); FDIC v. American Casualty Co., 528 N.W.2d at 608 ("[W]here, as here, insurance coverage is extended at a substantially reduced rate, courts should hesitate to assume the parties intended coverage to be as broad as that initially purchased at a higher rate.").
We find the approach taken by these courts to the issue to be problematic to the policy before us. First of all, U.S. Fire's policy, unlike American Casualty's policy, blurs any purported distinction between the main policy period and the tail period. The phrase "policy period" is utilized in both the original and tail provisions and is defined as:
the period of time elapsing between the inception date of this policy and the policy's date of termination, which shall be determined by the policy's date of expiration or cancellation, whichever occurs first.
When coverage was extended by the tail endorsement, the declaration page of the policy identified the policy period as "8/31/84 to 10/1/90." This certainly suggests an intent for the policy period to include the six-year discovery or tail period. Accord American Casualty Co. v. Sentry Fed. Sav. Bank, 867 F.Supp. 50, 61 (D.Mass.1994) ("This amendment blurs the distinction between policy year, policy period, and discovery period on which the Tenth Circuit [in Wilkinson] convincingly rested its decision.").
Further, we are not persuaded that the disparity in the premiums paid for the main and tail policies necessarily evince an intent for the coverages provided in these respective periods to be different. The appellees in this case have ably countered that the reduced premiums paid for the tail coverage could equally be attributed to the limited exposure that U.S. Fire had during the tail period. The appellees point out that the tail coverage was triggered only for errors or omissions which had already occurred during the main policy period. No new errors or omissions occurring during the tail period would have been covered. The appellees further assert that U.S. Fire's risks for the six-year tail period diminished with the passage of time by virtue of Florida's statute of limitations for professional liability actions.
We therefore turn our attention to the minority of jurisdictions which have construed the same policy provisions as the majority and have reached the diametrically opposite conclusion that tail coverage, like policy period coverage, is triggered by notice of occurrences or potential claims made during the discovery period even when suit is filed after such period. See McCuen v. American Casualty Co., 946 F.2d 1401 (8th Cir.1991); Sentry Fed. Sav. Bank, 867 F.Supp. at 61; Slaughter v. American Casualty Co., 842 F.Supp. 376 (E.D.Ark.1993), rev'd on other grounds, 37 F.3d 385 (8th Cir.1994). We think that these courts have correctly analyzed the issue in terms of there being no distinction made in the policy in the meaning of "claims" for purposes of the main policy and for purposes of the tail policy. E.g., McCuen, 946 F.2d at 1405-06 (holding, in light of the fact that "claim" is undefined in the discovery clause and "claim" is defined broadly in the original policy to include both actual and potential claims, the court will construe "claims" in context of entire policy to include "a claim arising after termination of the policy as to which notice of the occurrence giving rise to such claim was given during the discovery period"); Sentry Fed. Sav. Bank, 867 F.Supp. at 60-61; see also Slaughter, 842 F.Supp. at 378.
In U.S. Fire's policy, Condition II of the extended reporting or tail period makes it clear that the tail coverage is not different coverage but an extension of the coverage *627 granted by the original policy. Further, this same provision also makes it clear that tail coverage will be provided for any "claim ... first made against the insured for said acts, errors, or omissions, during the period of six (6) years following the date of cancellation or nonrenewal and written notice of such claim is received by the company during such period." Like the policy issued in McCuen, the term "claim" in the policy before us is not expressly redefined or limited in the extended reporting or tail provision. See McCuen, 946 F.2d at 1405. In the absence of an alternative definition in this tail provision by the insurer, we agree with the McCuen court that the phrase "claim" must be read in the context of the entire policy to include notice of occurrences or potential claims given during the discovery period. Id. at 1406. See also Willingham v. Travelers Ins. Co., 483 So.2d 778 (Fla. 3d DCA 1986) (stating policy's provision must be interpreted in the context of the entire agreement).
We are further guided in our holding by Gulf Insurance Co. v. Dolan, Fertig and Curtis, 433 So.2d 512 (Fla.1983) wherein our supreme court actually intimated that coverage would be triggered by the notice of an occurrence or potential claim during the tail period if such coverage is purchased. In Gulf Insurance Co., the insured was a law firm which had purchased a claims-made professional malpractice policy for the period November 20, 1978 to November 20, 1979. Id. at 513. Unlike the appellees in this case, the law firm did not exercise its option under the policy to purchase tail coverage. On the day before the policy was due to expire (i.e. November 19, 1979), the firm received a letter from a client indicating that the firm had been grossly negligent in its handling of a matter and instructing the firm to place its carrier on notice. The firm did not put the insurer on notice of this potential claim[8] until approximately three weeks later. Id. The insurer denied coverage on the grounds that "it was not notified during the policy period as expressly required in the contract." Id. at 514. The question before the supreme court was whether in the absence of tail coverage, the court could engraft a reasonable period of time after the policy's expiration for the reporting of an occurrence arising on the eve of the expiration date. The court found that it could not. The court, however, went on to state that had the firm purchased tail coverage, "[t]his extended discovery endorsement would thus have permitted Dolan [the insured] to report the claim in question to Gulf at a point in time after the termination date of the policy period." Id. at 516.
In any event, we agree with the appellees that at a bare minimum, the term "claim" as utilized in the tail period, when juxtaposed with "claim" as utilized in the original policy period, is ambiguous. As such, Florida law would require us to construe this ambiguity in favor of the insured. Prudential Property & Casualty Ins. Co. v. Swindal, 622 So.2d 467, 470 (Fla.1993); Pasteur Health Plan, Inc. v. Salazar, 658 So.2d 543, 545 (Fla. 3d DCA 1995), rev. denied, 666 So.2d 901 (Fla. 1996). This ambiguity over the meaning of "claim" in this policy is highlighted by the fact that the P.A.'s primary carrier (North River) specifically invited the P.A. to submit written notice of potential claimants prior to the expiration of the discovery period. Upon the P.A.'s compliance, the carrier's managing agent even assigned a claim number to the P.A.'s notice. It is clear to us that even the P.A.'s primary insurance carrier was also under the reasonable impression that notice of a potential claim or occurrence was sufficient for tail coverage.
Indeed, if U.S. Fire had not intended for the mere notice of a potential claim to trigger coverage during the tail period, it could have explicitly stated so in the policy or redefined "claim" for purposes of tail coverage. When confronted with an analogous issue of health insurance contract interpretation, this court wrote:
Florida courts have long held that all ambiguities in insurance contracts, as contracts of adhesion, should be construed in the light most favorable to the insured. *628 Firemans Fund Ins. Co. of San Francisco, Cal. v. Boyd, 45 So.2d 499, 501 (Fla.1950) ("[a] contract of insurance prepared and phrased by the insurer is to be construed liberally in favor of the insured and strictly against the insurer, where the meaning of the language used is doubtful, uncertain or ambiguous."), Mitchel v. Cigna Property & Casualty Ins. Co., 625 So.2d 862, 864 (Fla. 3d DCA 1993) ("insurance policies in general, and exclusions in particular, are interpreted strictly against the carrier"). See also Stuyvesant Ins. Co. v. Butler, 314 So.2d 567 (Fla.1975). Thus, any ambiguities and omissions should be construed in favor of [the policyholder]. If [the health insurer] had intended to exclude injuries that occurred as the result of an [All-Terrain Cycle] accident, they had every opportunity to say so explicitly. They have no cause now to complain because of their own oversight.
Salazar, 658 So.2d at 545.[9]

IV
Having concluded that the tail policy does afford coverage for the subject claims, we must now address the final issue of whether the P.A.'s September 21, 1990 letter constituted sufficient notice of the potential claims. U.S. Fire characterizes this letter as nothing more than a vague "laundry list" of contingent claims which was insufficient as a matter of law to permit U.S. Fire to realistically assess its residual exposure after the policy expired. See, e.g., McCullough v. Fidelity & Deposit Co., 2 F.3d 110, 112-13 (5th Cir.1993) (holding, for purposes of directors' and officers' liability policy, mere notification to a carrier of a bank's worsening financial condition due to loan losses is insufficient notice of a potential claim); Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 750 (7th Cir.1989) (finding bankruptcy trustee's notice to company of every matter handled by law firm was too broad and vague to trigger coverage under claims-made malpractice policy).
Under the facts and circumstances of this case, we find U.S. Fire's attempt to essentially feign ignorance about the import or significance of the September 21, 1990 letter to be disingenuous at best. This letter was sent specifically in response to the primary carrier's request for the names of the individuals and/or entities who were potential claimants in the failed Investex tax shelter partnerships. The claims being asserted by appellees Fleekops, Weiss and Dinnerstein all arise out of the failed Investex tax shelters. U.S. Fire was intimately knowledgeable about the nature of the claims being asserted in the Investex matter since it had already assumed the defense of one such claimant as a result of the depletion of the primary coverage. As U.S. Fire was aware of the alleged error or omission of the P.A., there is virtually nothing else that U.S. Fire could have been apprised of until the suits were actually filed by the persons and/or entities listed. Simply put, the error or omission was a specific act of rendering tax advice on a particular matter which affected a specific class of clients. See Sentry Fed. Sav. Bank, 867 F.Supp. at 60; accord FDIC v. Fidelity & Deposit Co., 45 F.3d 969, 974-75 (5th Cir.1995) (finding coverage under bond for losses that "arose out of the same pattern of conduct or scheme that was originally discovered" and were timely reported in proof of loss).
Moreover, we find that U.S. Fire waived any challenge to the adequacy of the September 21, 1990 letter when it failed to object to this notice or request any additional information from the P.A. until approximately ten months later and after the subject lawsuits had been filed against the P.A. See Federal Sav. & Loan Ins. Corp. v. Burdette, 718 F.Supp. 649, 654 (E.D.Tenn.1989) ("It is not in the interests of fairness or justice to permit an insurer to remain silent at the time of the purported notice is received, and then much later, after claims have been filed which may subject the insurer to some liability under the policy, permit the insurer to complain for the first time that notice was *629 not sufficient."); accord Florida Physicians Ins. Co. v. Stern, 563 So.2d 156, 159-60 (Fla. 4th DCA 1990) (using estoppel rationale).
Thus, we conclude that the trial court correctly deemed the September 21, 1990 notice to be sufficient as a matter of law.

CONCLUSION
For all of these reasons, the judgment under review is affirmed in its entirety.
Affirmed.
NOTES
[1] Appellees Morton Levin and Richard Myers are both former partners of the P.A. who intervened as plaintiffs in the declaratory action below.
[2] See Gula v. Commissioner, T.C.Memo 1989-486, 1989 WL 101453, 58 T.C.M (CCH) 42 (Sept. 6, 1989). The Gula court concluded that the Investex partnerships were not really set up for profit; nor did they actually own for tax purposes the land which was supposedly conveyed to them.
[3] A number of such claims were actually brought prior to the Gula v. Commissioner decision.
[4] The coverage provision of the policy read as follows:

I. COVERAGEPROFESSIONAL LIABILITY
The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as compensatory damages caused by acts, errors or omissions in the Insured's performance of professional accounting services for others, provided that claim is first made against the Insured for said acts, errors, or omissions during the policy period and written notice of said claim is received by the Company during the policy period.
[5] Specifically, North River's agent wrote as follows (emphasis ours):

I have discussed with several of you the likelihood of future additional claims and litigation from former clients who have had tax shelter deductions disallowed by the Internal Revenue Service. Although only a few claims have been filed to date, it would appear likely that others may follow.
* * * * * *
Moreover, I am concerned with exposure of future claims arising from your work with clients in investing in tax shelters.
* * * * * *
At this time, and in light of the impending expiration of the limited extended reporting period, I would appreciate your cooperation in providing this office with a list of any potential claims which may be reported within this policy period, along with the particulars pertaining to each claim.
[6] The P.A.'s letter addressed to North River, U.S. Fire and Crum & Forster stated as follows:

Gentlemen:
I am writing on behalf of Stuart Rothchild, insured under the above referenced policies. You have previously been placed on notice of a potential claim or claims arising from work performed for firm clients investing in tax shelters. The purpose of this letter is to provide you with the best available information on the entities and investors for whom a claim may be made. Enclosed is a list of the investments and investors.
Please consider this a claim made under each of the above referenced policies. Please advise if any additional information is required at this time. Mr. Rothchild and I will give our full cooperation in any further investigation you may wish to undertake.
 /s/

[7] We note that every one of these jurisdictions was construing a policy from American Casualty Company whose terms and provisions were presumably identical in every instance.
[8] Apparently, suit had not been filed. Nevertheless, the supreme court referred to the dispute as a "claim" for purposes of both the underlying policy and the unpurchased extended discovery endorsement.
[9] We think that appellees paraphrased it best when they said:

"Insurance is unlike Forrest Gump's box of chocolates. The insured is entitled to know exactly what it's getting for its premiums."